HOUSTON v. SHEAR et al. (No. 5957.)

(Court of Civil Appeals of Texas. Austin. Jan. 15, 1919. On Motions for Rehearing, April 16, 1919. On Appellees' Second Motion for Rehearing, May 2, 1919.)

1. EXECUTION ☜268—SALE OF LAND SUBJECT TO CONTRACT LIENS—RIGHT ACQUIRED.

Where lands subject to contract liens are sold on execution against the owner, the purchaser at execution sale succeeds to his rights, and equity confers upon him the privilege of redemption, but only on condition that the rights acquired at execution sale are valid.

2. EXECUTION ☜251(2) — SETTING ASIDE SALE—IRREGULARITIES—INADEQUATE PRICE.

Statutes governing executions are for the most part directory in their nature, and mere irregularity in connection with gross inadequacy of consideration is insufficient to vacate a judicial sale, unless the irregularity in some way conduced to that inadequacy; although, when the price is enormously inadequate, slight irregularities will be sufficient to justify setting aside the sale by a direct proceeding therefor.

3. EXECUTION ☜250—ADEQUACY OF PRICE—BUYER'S AGREEMENT TO PAY LIENS — REDEMPTION.

The sale for the sum of $85 of property of an admitted value of $85,000, but subject to valid and subsisting liens aggregating a sum considerably in excess of this value, would not warrant an equity court in nullifying the sale for inadequacy of price, where such liens must be paid to secure and enjoy good title to the property and as a condition of redemption.

4. BANKRUPTCY ☜11 — JURISDICTION OF STATE COURT—LIMITATION.

Authority for the exertion of exclusive and summary jurisdiction by a court of bankruptcy must find enumeration in the acts of Congress, prescribing a "uniform system of bankruptcy of the United States" (U. S. Comp. St. §§ 9585–9656), since such tribunals are creations of statute, and can exercise no judicial powers other than those authorized.

5. EVIDENCE ☜43(4) — JUDICIAL NOTICE — PROCEEDINGS IN OTHER COURTS — BANKRUPTCY.

State courts and courts other than the initial court of bankruptcy are not required to take judicial cognizance of the proceedings in a bankruptcy court.

6. BANKRUPTCY ☜216 — JURISDICTION OF STATE COURT — BANKRUPTCY PROCEEDINGS AGAINST JUDGMENT DEBTOR.

A state court was not precluded from jurisdiction for the judicial sale of property, where its judgment was undisturbed by any appropriate action of the bankruptcy court, in which an involuntary petition was filed by judgment debtor's creditors, by taking actual possession of bankrupt's estate, or enjoining execution or sale, or even a suggestion or motion to stay, made in the state court.

7. **BANKRUPTCY** ⬅⟹387—COMPOSITION—"RE-INVEST"—NO ADJUDICATION.

The word "reinvest," as used in Bankruptcy Act, § 70-f (U. S. Comp. St. § 9654), providing that "upon the confirmation of the composition offered by a bankrupt the title to his property shall thereupon reinvest in him," means that the owner is to receive the property anew, and the act is without application where there was no divestment of the title, there having been no adjudication in the involuntary proceedings.

[Ed. Note.—For other definitions, see Words and Phrases, Second Series, Reinvest.]

8. **CORPORATIONS** ⬅⟹547(1) — INSOLVENCY — JUDGMENT CREDITORS—VALIDITY OF EXECUTION SALE.

Where a corporate judgment debtor was insolvent, and had ceased to do business when execution was levied on its property, the judicial sale conveyed no title as against the rights of other creditors of the corporation.

9. **CORPORATIONS** ⬅⟹547(1) — INSOLVENCY — JUDICIAL SALES AFTER PAYMENT OF OTHER DEBTS—VALIDITY.

Where a corporation has become insolvent and ceased to do business, the title to its property is vested in its officers in trust for the benefit of creditors; but when its debts are paid the trust is discharged, and presents no impediment to title acquired under judicial sale.

10. **EXECUTION** ⬅⟹268 — REDEMPTION FROM LIENS—TENDER—PLEADING.

A redemptioner, purchaser at execution sale, need not, as a condition precedent to the exercise of the right to redeem the property from existing vendor's and other liens, make his tender prior to the filing of suit; an offer to pay what is due, incorporated in the bill, being sufficient.

11. **EXECUTION** ⬅⟹268 — REDEMPTION FROM LIENS—GOOD FAITH—ABILITY AND WILLINGNESS TO REDEEM—EVIDENCE.

Where a purchaser at execution sale, seeking redemption of the property from existing liens, gave uncontradicted testimony that he was ready, able, and willing to pay off and discharge the incumbrances, the court should determine his ability and good faith, by according him opportunity upon prescribed terms and conditions.

12. **EXECUTION** ⬅⟹268 — PURCHASER'S REDEMPTION FROM LIENS—FRACTIONAL INTEREST.

Where a purchaser at judicial sale is entitled to redeem the properties from existing liens, he may apply any lawful available means to secure the money, which the court might direct paid by way of redemption, and it is immaterial that his testimony shows that when redeemed his interests will be only a fractional portion of the value of the property, and that the remainder will be owned by others furnishing him money.

13. **EXECUTION** ⬅⟹278—REPAYMENT OF MONEY PAID TO PRESERVE THE PROPERTY.

Money expended for the composition with creditors to prevent the property from being sold in bankruptcy proceedings was expended in the preservation of the property, and the purchaser at execution sale had a right to recover possession on repayment of such amounts thereof as remained unpaid, together with other liens.

### On Motions for Rehearing.

14. **SUBROGATION** ⬅⟹22, 26 — NECESSITY OF PAYMENT—VOLUNTEER.

The right of purchaser at execution sale to redeem from lien claims is restricted to those properties to which he acquired legal title, and by payment of liens on other property he is not subrogated to the judgment debtor's right therein, where not compelled to do so to save himself a loss, since the right of subrogtaion is never accorded to a mere volunteer.

15. **EXECUTION** ⬅⟹268 — PURCHASER'S REDEMPTION FROM LIENS — DEDUCTION OF AMOUNTS PAID TO PRESERVE PROPERTY.

Where a large part of the fund employed in effecting a composition with the general creditors of a judgment debtor, which inured to debtor's benefit, was derived from sale and rental of debtor's properties, the amount realized therefrom should be properly deducted from the amount paid in redemption from liens by purchaser at judicial sale.

### On Appellees' Second Motion for Rehearing.

16. **EXECUTION** ⬅⟹268 — PURCHASER'S REDEMPTION FROM LIENS — DEDUCTION OF AMOUNTS PAID TO PRESERVE PROPERTY—INSURANCE MONEY.

Where the agreement by a grantee and assignee of judgment debtor corporation to advance money for composition with its unsecured creditors was primarily between the original lienholders and himself, rather than the corporation, whether the purchaser at judicial sale can deduct from the amount paid to redeem from liens on properties actually covered by his purchase the amount paid from insurance money received for destruction of property acquired depends upon whether the destruction of the property was before or after judicial sale.

Appeal from District Court, Travis County; George Calhoun, Judge.

Suit by H. M. Houston, as purchaser, under a judgment against the Farmers' & Ginners' Cotton Oil Company, Incorporated, and another, jointly, against H. H. Shear and others, as grantees and assignees of such judgment debtors, to redeem certain properties claimed to have been purchased at execution sale. From a judgment denying the right of redemption and the cancellation of several sheriff's deeds under which he claims title, plaintiff, H. M. Houston, appeals. Judgment reversed, and cause remanded for new trial.

Fiset, McClendon &.Shelley, of Austin, for appellant.

J. D. Williamson, of Waco, and White, Cartledge & Wilcox and Lightfoot, Brady & Robertson, all of Austin, for appellees.

---

FISHER, Special Judge. Appellant, H. M. Houston, as purchaser under a judgment against the Farmers' & Ginners' Cotton Oil Company, Incorporated, and J. L. Hunter, jointly, brought suit in the district court of Travis county against appellees, H. H. Shear, the Austin National Bank, the Boatmen's Bank, D. T. Bomar, E. P. Wilmot, and C. R. Laws, as grantees and assignees of such judgment debtors, to redeem certain properties claimed to have been purchased by him at execution sale. From a judgment denying the right of redemption and the cancellation of the several sheriff's deeds under which he claims title, appellant prosecutes this appeal.

The trial court's findings of fact are both lengthy and elaborate. For a consideration of the merit of the several questions raised we do not deem it necessary that there be a reiteration of these findings. Such findings as we conceive to be controlling of the substantive rights involved, supplemented by such as are particularly referred to in the body of the opinion, may be summarized in the following:

### Findings of Fact.

(1) On February 17, 1914, J. L. Hunter conveyed to the Farmers' & Ginners' Cotton Oil Company, a corporation, designated real estate in Travis county, for which it executed, in part consideration therefor, its certain vendor's lien note for $15,000, which, of contemporaneous date, was transferred by the grantor, J. L. Hunter, to D. T. Bomar.

(2) Subsequent to this transaction, and at various times prior to November 19, 1915, the date upon which certain creditors brought a bankruptcy proceeding against the Farmers' & Ginners' Cotton Oil Company, said company had executed to the several appellees notes secured by deeds of trust in various amounts on which there was due and owing at the time of trial approximately the sum of $95,000. The parties agreed that at the date of trial the properties had a value of $85,000.

(3) In addition to the secured indebtedness against the properties, appellees, or certain of them, had paid out, or caused to be paid out, for the protection and preservation of the properties, at the date of trial some $4,396.28.

(4) On November 19, 1915, as previously recited, certain creditors filed a petition in involuntary bankruptcy against the Farmers' & Ginners' Cotton Oil Company, alleging as grounds therefor acts of bankruptcy and insolvency. The corporation answered under oath, denying such acts and the fact of its insolvency. Subsequent to the filing of the petition no further action was taken in the proceeding until a composition was effected with its general creditors, as hereinafter stated, it being agreed that there had been no adjudication of the alleged bankrupt in the proceeding referred to, that no trustee was ever appointed, and that at no time were the properties of the Farmers' & Ginners' Cotton Oil Company ever placed in the actual possession of a bankruptcy court through the agency of a receiver or otherwise.

(5) February 8, 1916, and subsequent to the institution of the bankruptcy proceeding, one M. M. Graves obtained judgment in Harris county, Tex., against the Farmers' & Ginners' Cotton Oil Company and J. L. Hunter, jointly, for the sum of $273. Execution issued thereon, and the properties in controversy were sold by the sheriff of Travis county, Tex., to appellant on July 4, 1916, for the aggregate sum of $85, and properly executed deeds, pursuant to sheriff's sale, were placed of record in the deed records of Travis county on July 6, 1916. The state court rendering the judgment against the Farmers' & Ginners' Cotton Oil Company and its codefendant, J. L. Hunter, had no actual notice of the proceeding in bankruptcy against the former, and it is admitted that no action was taken to stay the proceedings in the state court subsequent to the filing of the petition in involuntary bankruptcy. It appears that appellant was notified of the pendency of the bankruptcy proceedings on the day of sale and shortly prior to his purchase at execution sale.

(6) July 10, 1916, the Farmers' & Ginners' Cotton Oil Company, in consideration of the cancellation and discharge of the lien indebtedness against the properties, executed its deed of conveyance to appellees, C. R. Laws, E. P. Wilmot, and B. T. Bomar. Subsequently, and prior to February 15, 1917, appellees Laws, Wilmot, and Bomar conveyed the properties which they had acquired to the appellee H. H. Shear, who is the real contestant of appellant herein. On the date last mentioned the Farmers' & Ginners' Cotton Oil Company filed in the court of bankruptcy an offer of composition with its general and unsecured creditors, which, after appropriate notice and a compliance with other prerequisites, was in all things confirmed by the court, and on March 20, 1917, the proceeding against the corporation was in all things dismissed.

### Opinion.

[1] Where, as here, lands subject to contract liens are sold on execution against the owner, the purchaser at execution sale succeeds to his rights, and equity confers upon him the privilege of redemption, but only on condition that the rights acquired at execution sale are valid. Willis v. Smith, 66 Tex. 31, 17 S. W. 247; 27 Cyc. (Mortgages) p. 1806.

[2] Appellee challenges the validity of the sales under which appellant claims, contending that the same were void: (1) Because of statutory irregularities, accompanied by inadequacy of price; (2) that at the date of sale the properties were in custodia legis, under administration by a court of bankruptcy,

and that upon a composition proceeding had therein this in legal effect restored the title to the bankrupt, freed from the claims sought to be maintained by appellant; (3) that the judgment debtor (the Farmers' & Ginners' Cotton Oil Company) being insolvent, and having ceased to be a going concern at and before the date of the levy of the execution under which the properties were sold, its assets became a trust fund for all of its creditors, and consequently that appellant could not acquire at sheriff's sale the title to properties subject to pro rata distribution among all the creditors; and (4) the validity of the court's finding that appellant, in seeking to redeem, made no tender of the amounts due and secured by subsisting liens upon property, or expenses or advances paid out by appellees, or certain of them, of them, for their necessary preservation.

We shall review the availability and the validity of these contentions in the order outlined.

Statutes governing executions are, for the most part, directory in their nature. Pearson v. Flanagan, 52 Tex. 266; Odle v. Frost, 59 Tex. 684. And, as stated in Allen v. Pearson, 60 Tex. 607:

"* * * It is apprehended that under no system would a mere irregularity, when taken in connection with gross inadequacy of consideration, be held sufficient ground for vacating a judicial sale, unless that irregularity in some way conduced to that inadequacy."

The principle is again reiterated in House v. Robertson, 89 Tex. 687, 36 S. W. 252, in which the Supreme Court says:

"It is true that inadequacy of price alone is not as a rule a sufficient reason for avoiding a sheriff's sale * * * under a valid judgment and execution, but, when the price paid for the land at such sale is enormously inadequate and disproportioned to the value of the land sold, slight irregularities will be sufficient to justify setting the sale aside by a direct proceeding for that purpose. Allen v. Stephens, 18 Tex. 672; Taul v. Wright, 45 Tex. 395."

[3] Under this criterion, would we be justified in holding under the facts that the irregularities complained of proximately influenced the trifling price for which the properties were actually sold? It is admitted that the properties were worth the sum of $85,000, and were sold under execution for no more than $85. Manifestly, if property valued at $85,000 was acquired for the paltry and insignificant sum of $85, without further obligation on the part of the purchaser, a court of equity would be moved to accord relief against such gross and flagrant inadequacy upon any pretext open to it. But should property, as in the instant case, of an admitted value of $85,000, but subject to valid and subsisting liens aggregating sums considerably in excess of this value, be sold for $85, would a court of equity be warrant-

ed in nullifying the sale upon the ground of inadequacy of price? We think not; and when it is considered that appellant, to secure and enjoy good title, must pay off liens and charges, measuring many thousands in excess of the admitted value placed upon the properties purchased, we are presented, not with the question of inadequacy of price, but rather, as it seems to us, the anomalous condition of a purchaser buying property at a price in excess of its value. With this, however, we are not concerned, and in view of the admitted lien obligations upon the property which must be discharged by appellant as purchaser, as a condition to his privilege of redemption, we conclude that the contention is without merit.

[4] The next question in order is: Was the sale of the properties to appellant rendered void because of the pendency at the time of a bankruptcy proceeding against the judgment debtor (Farmers' & Ginners' Cotton Oil Company)? This is the position of appellees predicated upon the proposition that the filing of the petition in bankruptcy, in legal contemplation, placed the property of the bankrupt in custodia legis, and upon this hypothesis that no court other than the court of initial jurisdiction could properly entertain suits affecting the title or estate of a bankrupt.

If this view is tenable, the authority for the exertion of exclusive and summary jurisdiction by the court of bankruptcy must find enumeration in the Acts of Congress prescribing a "uniform system of bankruptcy of the United States and Territories" (U. S. Comp. St. §§ 9585–9656), since it is fundamental that such tribunals are creations of statute, and can exercise no jurisdictional powers other than those authorized.

[5] It cannot be questioned that the Acts of Congress confer upon designated federal courts the exclusive rights to administer the benefits of the so-called Bankruptcy Act, and, as stated by the Supreme Court in Acme Harvester Co. v. Beekman Lumber Co., 222 U. S. 300, 32 Sup. Ct. 96, 56 L. Ed. 208:

"It is the purpose of the bankruptcy law, passed in pursuance of the power of Congress, to establish a uniform system of bankruptcy throughout the United States, to place the property of the bankrupt under the control of the court, wherever it is found, with the view to its equal distribution among the creditors. The filing of the petition is an assertion of jurisdiction with a view to the determination of the status of the bankrupt and a settlement and distribution of his estate. The exclusive jurisdiction of the bankruptcy court is so far in rem that the estate is regarded as in custodia legis from the filing of the petition. It is true that under section 70a of the Act of 1898 [U. S. Comp. St. § 9654], the trustee of the estate, on his appointment and qualification, is vested by operation of law with the title of the bankrupt as of the date he was adjudicated a bankrupt, but there are many provisions of the law which show its purpose to hold the property of

the bankrupt intact from the time of the filing of the petition, in order that it may be administered under the law if an adjudication in bankruptcy shall follow the beginning of the proceedings. * * *"

The question, therefore, is, Did the admitted failure by the court of bankruptcy to exercise any of the powers which would have withdrawn the estate of the bankrupt from interference on the part of other courts leave the latter free to entertain suits against the bankrupt, and the corresponding power to reach the properties of the bankrupt, title to which was in it at the time a sale was had pursuant to the judgment of the state court? To hold negatively would be to announce that state courts, or any other court than the initial court of bankruptcy, must take judicial cognizance of the proceedings in that court, contrary to well-settled judicial announcements. Conner v. Long, 104 U. S. 228, 26 L. Ed. 726; Bank v. Bray, 132 S. W. 968.

[6] We therefore hold that the state court, under whose judgment appellant purchased, was not precluded from entertaining and exercising jurisdiction. Its judgment being undisturbed, the judgment creditor was entitled to all the remedies authorized by law for its enforcement, and could competently proceed with the satisfaction of his remedies, until his rights were cut off or abbreviated by appropriate action had in the court of bankruptcy, either by it taking actual possession of the estate of the bankrupt before the rights of third parties attached, or, upon proper predicate, enjoining an execution and sale of any of the estate of the bankrupt awaiting a determination of the question of adjudication. No such action was taken in the instant case, nor was there any suggestion made in the state court, by motion to stay or otherwise, inviting its attention to the pendency of the bankruptcy proceeding against the Farmers' & Ginners' Cotton Oil Company, the judgment debtor. The court of bankruptcy did nothing, in the exercise of its jurisdictional powers, subsequent to the filing of the petition. The Circuit Court of Appeals for the Eighth Circuit, in Re Rathman, 183 Fed. 913, in particular 925, 926, 106 C. C. A. 253, 265, in discussing the essential requirements of summary jurisdiction, says:

"If the commencement of bankruptcy proceedings without more, without any act of the bankruptcy court, or any of its officers, to give notice to adverse claimants, or to reduce the property claimed to belong to the bankrupt to the possession of the officers of that court as his property, gives it constructive possession, and hence a legal custody that enables it to determine by summary proceedings the merits of adverse claims to liens and titles to such property in the actual possession of others, then no case could ever arise in which any other court could have jurisdiction by plenary suit to determine the merits of such claims; for in every case a bankruptcy proceeding is com-

menced, and the only ground on which the jurisdiction to determine summarily the merits of such claims is sustained is that the bankruptcy court's legal custody of the property excludes the jurisdiction of every other court, and gives it the power to determine summarily all claims to liens upon, or interests in, the property in such custody. But this theory flies in the face of the settled rule, repeatedly announced by the Supreme Court, that the actual possession by the bankruptcy court is the indispensable condition of its exclusive and of its summary jurisdiction here."

[7] The contention is further made in this connection by appellees that the sales relied upon by appellant are void, for the reason that, upon a confirmation of the composition had in the court of bankruptcy with the general creditors of their grantor (the Farmers' & Ginners' Cotton Oil Company), its title under the operation of section 70f of the Bankruptcy Act reinvested in the bankrupt, freed and discharged from such claims as are sought to be asserted by appellant. The provision (section 70f) provides:

"Upon the confirmation of a composition offered by a bankrupt, the title to his property shall thereupon reinvest in him."

It requires no extended comment to show that the provisions cannot be properly invoked here to defeat the rights acquired by appellant as purchaser at execution sale. For the bankrupt to be reinvested with title means, if the word "reinvest" is to be given the meaning and application apparently intended, that the owner of the title is to receive it anew. This necessarily implies that, before there could be any reinvestment, there must have been a divestment of the title. If, as undisputed, there was no divestment of title because of no adjudication and no appointment of a trustee in whom the title, under operation of the act, vests, how could the bankrupt, appellees' assignor, be reinvested with title to the estate upon the confirmation of the composition, when none of the conditions which would have divested it of title were ever called into operation? The bankrupt was never divested of title to his estate in contemplation of the section relied upon, and since, prior to a confirmation, appellant purchased such title as the defendant in execution then had, his rights as purchaser could not be affected by a composition proceeding to which he was not a party.

[8] Appellees next contend that the sheriff's sale was void for the reason that the Gin Company at the time of the levy of the execution was insolvent, and had ceased to be a going concern.

It was held by this court in Harrigan v. Quay, 27 S. W. 897, that "the fact that a corporation may be insolvent does not deprive the creditor of his right to sue it and to levy upon its property to satisfy his judgment." To the same effect is Moon v. Grain Co., 13 Tex. Civ. App. 103, 35 S. W. 339, by

the Court of Civil Appeals for the Fourth District.

It will be observed that in the first case above cited nothing is said about the corporation having ceased to do business. In the second case the defendants alleged that the Grain Company had not ceased to do business when the attachment was levied; and the findings of fact show that this was true, though the Grain Company was then insolvent.

In Wright v. Euless, 12 Tex. Civ. App. 136, 34 S. W. 302, it was held by the Court of Civil Appeals for the Second District that a creditor who attaches the property of an insolvent corporation, which has ceased to be a going concern, acquires no right thereby as against other creditors of such corporation. To the same effect is Rogers v. Lumber Co., 11 Tex. Civ. App. 108, 33 S. W. 312.

These decisions are based upon the doctrine announced by our Supreme Court in Lyons Thomas Hardware Co. v. Perry Stove Co., 86 Tex. 143, 24 S. W. 16, 22 L. R. A. 802, and Orr Shoe Co. v. Thompson, 89 Tex. 502, 35 S. W. 473. In the latter case Mr. Justice Brown, speaking for the court, said:

"In the case of Lyons Thomas Hardware Co. v. Perry Stove Mfg. Co., 86 Tex. 143 [24 S. W. 16, 22 L. R. A. 802], this court held that when a corporation becomes insolvent and has ceased to do business, or, by the act of making a deed of trust, mortgage, or conveyance of its property, terminates its business with no intention or ability to resume it, it has no power to give preference to one or more of its creditors over others; but its assets become a trust fund in the hands of its directors, to be distributed pro rata among its creditors to the extent that such assets are not incumbered by valid prior liens. The rights of all creditors in the fund are by law fixed so soon as the conditions arise out of which the trust relation springs. After the trust attaches, neither the corporation nor the trustees can by any act of theirs affect the rights of the creditors, and we think that it necessarily follows that no creditor can, by any act of diligence on his part, accomplish that which neither the corporation nor trustees could do by agreement with him. In such case the trust attaches in favor of creditors without acceptance by them. If one could secure an advantage by garnishment or attachment over other creditors, the equality of right created by law would be destroyed. Indeed, it would be a remarkable proposition to say that one by legal process may appropriate to himself that which belongs equally to him and to others."

It being admitted by the parties hereto that the Gin Company was insolvent, and had ceased to do business when the execution was levied on its property, the sale under such execution conveyed no title, as against the rights of other creditors of said corporation. But no such creditors are asserting any rights to such property in this suit. No such creditors are parties to this suit. In this respect this case is similar to the case of Florsheim v. Wettermark, 10 Tex. Civ. App. 102, 30 S. W. 506. The attempt to have such distribution made by the bankruptcy court was abandoned when the proceedings therein were dismissed under the composition proceedings.

[9] In the instant case there is this fact in addition to those stated in Florsheim v. Wettermark, supra: There are no creditors who could demand a ratable distribution of the estate of the Gin Company. The debts of all creditors were discharged in the composition proceedings, except the debts of the secured creditors, whose debts, together with the amounts expended in the preservation of the property, appellant herein seeks to pay.

As stated in Lyons v. Perry and in Orr v. Thompson, supra, upon the Gin Company becoming insolvent and ceasing to do business, title to its property was vested in its officers; but such title was a special title, held in trust for the benefit of creditors. This title ceased when the debts of the creditors, the beneficiaries in such trust, were discharged. There can be no trust estate without a cestui que trust.

For the reasons hereinbefore stated in our discussion of the effect of the bankruptcy proceedings, we hold that title to its property remained in the Gin Company, notwithstanding that it became insolvent and ceased to do business, subordinate only to the special title vested by law in its officers in trust for the creditors of such corporation. Such trust estate having ceased, its former existence presents no impediment to the title acquired by appellant under the sheriff's sale.

[10] The trial court found that appellant was not, at the time of trial, ready, able, or willing to redeem the properties in controversy by paying off the amount of valid and subsisting liens to which the properties were subject, and that he had never offered, and did not at the time of trial offer, to pay the amounts necessarily expended by appellees in their necessary preservation.

The finding is, in essence, a deduction from the facts testified to by appellant alone. The evidence on the issue, so far as material, is as follows:

"I did not at any time prior to the filing of the petition in this case know the exact amount of money that was due on the various liens, principal, interest, and attorneys' fees, machinery liens, insurance charges, and other matters that constituted charges against these properties. I am now ready and able and have the ability to pay such amount as may be found to be due on such items against this property if it is given to me by way of redemption. * * *

"With regard to my statement that I had the ability and the readiness to redeem this property, I have not the money arranged and in bank to pay for this property if it should be adjudged to me, but it will be there within forty-eight hours. I have in my pocket a contract that I think would satisfy the court. That contract is not yet executed and put in the shape of money. My estimate is that it would take for-

ty-eight hours to get that money up. 1 am contributing to the extent of twenty-five thousand dollars to buy the property. That amount of money is all provided for; I can borrow it. All of the remainder is provided for. I have made provision for and can borrow twenty-five thousand dollars as my part of it. As to the remainder, I have a contract in relation to it; it is executed, but not converted into money. That contract is executed by thoroughly substantial persons. My interest in the redemption of this property I am seeking in this suit is limited to twenty-five thousand dollars. If this property should be redeemed, there are other parties that will furnish the principal part of the money. As to my not being interested in it further than I have stated, I have a contract with those parties for the control and operation of the business. I have an arrangement with reference to operating it and controlling it for the several owners of the property. I have made provision for a sum of money which, in the opinion of my attorneys, is in excess of any possible decree of the court, and to provide for any additional expense connected with acquiring the property and putting it in running condition and doing business and for paying attorneys' fees. That sum is $140,000. That includes the payment of attorneys' fees and necessary expenses to put the mill in proper running order. The amount allowed for those expenses is what is left over and above the decree of the court. I have figured on an amount that will be left over, but have not arrived at it. I have figured on an amount of about $126,000, and the other $14,000 would be expended in the manner I have indicated. I do not say that $126,000 is the maximum amount that would be available to redeem the property. I have already stated that whatever amount would be needed to redeem the property up to $140,000 was available for that purpose. In other words, I figure that $140,000 would cover whatever might be necessary for me to pay to redeem the property, pay my attorneys' fees, and put the mill in proper running order. None of the parties who are to be interested in this property, if it is redeemed, are parties to this suit except myself. * * *

"The arrangement referred to is to become effective after I secure the property in this proceeding, if I do secure it. It is tentative, and depends upon the recovery by me of the property in this suit. My arrangement is to raise as much as $140,000, and to use such portion of it as may be necessary to redeem these properties, the balance, if any, to be used for the other purposes I have mentioned."

Appellees seek to defend the correctness of the court's finding upon the grounds, generally, (1) that, no offer of redemption having been made prior to the filing of the bill, the right to redeem was lost; (2) that there was no or insufficient evidence which would have justified the court in finding that appellant was either ready, able, or willing to make good his tender by paying off the liens and charges against the properties; and (3) that he was not seeking to redeem the properties for himself, but for the use and benefit of others.

It being undisputed that no tender was made by appellant to appellees or their predecessors in interest prior to the filing of the bill, did this failure cut off the equity of redemption where it is both alleged and shown that, prior to the institution of suit, he did not know the exact amount of lien indebtedness against the property, nor with certainty of the distributive interests of the several appellees? That appellant might have made the ascertainment with certainty is strongly suggested. Still we do not understand, nor have we found any well-considered adjudication announcing the requirement, that the redemption must, as an indispensable condition to the exercise of the right of redemption, make his tender prior to the filing of suit. An offer to pay what is due, if incorporated in the bill, is sufficient. Spann v. Sterns, 18 Tex. 563; Ward v. Worsham, 78 Tex. 180, 14 S. W. 453; Perego v. White, 77 Tex. 196, 13 S. W. 974; Maloney v. Eaheart, 81 Tex. 283, 16 S. W. 1030; 27 Cyc. title Mortgages, p. 1845. Appellant met this requirement, specifically alleging:

" * * * Plaintiff further avers that, through the public records, or any other means at his hands, he is not able to determine with any degree of accuracy the total amount of money which is required to be paid by him for the purpose of having the title to all of the above-described property vested in him; but plaintiff further avers that he is ready, able, and willing, and hereby offers, to pay such of said defendants, or their assigns, as upon trial of this cause may be found to be entitled to receive same, the full amount of money which the court may decree that he should be required to pay in order to redeem all of said property from said liens and to have the title thereto vested in him."

[11] The next inquiry in order is, Was the court authorized in deducing from the plaintiff's evidence that he was not, at the date of trial, either ready, able, or willing to pay off and discharge the incumbrances with which the properties were charged, including, besides the ascertainable contract liens, advances made by appellees, or certain of them, for the necessary and proper preservation of the properties? There was no actual tender at the time of trial. Appellant did, however, testify, and his testimony stands uncontradicted, that he had made arrangements for the procurement of such funds as might be necessary to discharge all liens and charges as were judicially ascertained and established by the court, and that the money would be available for the purpose within a period of 48 hours from the court's announcement of the amount found to be due. In legal contemplation, was this showing sufficient to give appellant the right of redemption if he made good his assertion to pay off the amounts within the time stated or within a time fixed within the discretion of the court for the exercise of the privilege? There was but one way, it seems to us, in which the ability and good faith of appellant could be authori-

tatively determined, and that was to accord him the opportunity of payment. It was the province of the court, in the exercise of its equity powers, to prescribe the terms and conditions under which it would receive and authorize payment, or forever foreclose the privilege of redemption if appellant did not avail himself of the right within the time and upon the conditions decreed. Jones v. Porter, 29 Tex. 456; Simkins, Equity, p. 361.

[12] Appellees further contest the sufficiency of the tender upon the ground that appellant's own testimony shows that he was not seeking redemption for his exclusive benefit, but that his interest in the properties, in the event it was established that he was entitled to redeem, constituted only a fractional portion of their value. We do not concur in this position. Appellant, if entitled to redeem the properties could employ any lawful means available and open to him to secure the money which the court might direct paid by way of redemption. If appellant had secured, as his uncontradicted testimony suggests, the agreement of others to advance the funds in the redemption of the properties, is the right to be defeated merely because the redemptioner invokes the aid of another for the protection and exercise of a remedy which equity conferred upon him? We think not, for to hold otherwise, under such circumstances as are here presented, would be to defeat the exercise of the very right which the principle of redemption recognizes. In contests of this nature, the court is primarily concerned in determining whether the redemptioner is entitled to the exercise of the equitable privilege. If it concludes affirmatively, its only remaining consideration is to give timely and appropriate protection to those having senior interests in the property sought to be redeemed. If their interests are protected and discharged, how can complaint be urged that the fund in redemption may have come or is to come through the agency of a third person?

[13] For the reasons stated, we conclude that the appellant had the right to pay off the liens against the property purchased by him at the execution sale, and to recover possession of such property upon making such payments, together with the amounts expended by appellee Shear in the preservation of such property. As the amount expended by Shear in the composition proceedings prevented the property of the Gin Company from being sold in the bankruptcy proceedings, we hold that it was expended in the preservation of such property. It appears that a portion of the money so expended by Shear was returned to him from the proceeds of a certain fire insurance policy. It is not made to appear with certainty to whom the proceeds of this policy belonged. We are therefore unable to determine the exact amount appellant

should pay. The determination of the amounts to be paid in redemption can be computed and fixed by the trial court.

For reasons stated the cause is reversed and remanded for a new trial in accordance with the principles herein announced. Reversed and remanded.

## On Motions for Rehearing.

Upon grounds and for reasons assigned in an opinion rendered herein on January 15, 1919, we reversed and remanded this cause. In this disposition we still adhere. We find, however, upon an examination of the pending motions for rehearing, that we failed to make a specific disposition of certain of the issues which, in two respects at least, we conceive to be material to the rights of the parties.

The first is whether appellant, as purchaser of the properties of the Farmers' & Ginners' Cotton Oil Company and one of the gin properties, would, upon payment of all the primary liens resting against the mill properties which would operate as a discharge of the secondary liens against the gin properties, be entitled, under the doctrine of subrogation, to assert title to such unacquired gin properties.

The second is whether the moneys derived by the appellee Shear, or his predecessors in interest, from the sale and rental of designated gin properties, and the collections realized on account of the destruction of certain gin properties by fire, and employed by appellee in effecting the composition with the general creditors of the Farmers' & Ginners' Cotton Oil Company, should be deducted from the amount to be paid by appellant by way of redemption, where it appears that the property sold, as well as the property destroyed, was incumbered to secure liens which must must be discharged by appellee as a condition to his exercise of the right of redemption.

Our additional findings of fact upon these respective contentions may be summarized as follows:

1. The Farmers' & Ginners' Cotton Oil Company, at various dates prior to November 19, 1915, the date upon which certain of its general creditors filed a petition in involuntary bankruptcy against it, had borrowed on its promissory obligations sums which, with interest and attorney's fees computed to the date of judgment rendered herein, aggregated some $137,000. This indebtedness was secured, or sought to be secured, by a pledge or hypothecation of all of its assets, consisting of certain acreage, mill sites, improvements, etc., located in the city of Austin. J. L. Hunter, who, as found in the original opinion, was a joint judgment debtor with the Farmers' & Ginners' Cotton Oil Company, under which appellant, Houston,

purchased designated properties, was individually liable upon many of said mill company's obligations; and on October 1, 1915, but subsequent to the execution of the notes of said Farmers' & Ginners' Cotton Oil Company, Hunter, for the purpose of additionally securing or supplementing the security of such obligations of said mill company, conveyed in trust certain gin properties, scheduled as follows:

First. Two acres, constituting the Del Valle gin.

Second. One and three-tenths acres, constituting the Creedmoor gin.

Third. Lots 6, 7, 8, 9, 10, 11, 12, and 13, block 2, town of Sprinkle.

Fourth. Lots 19 and 20, block 2, town of Sprinkle.

Fifth. Lots 5 and 14, block 2, town of Sprinkle.

Sixth. Lots 19 and 20, block 2, town of Sprinkle.

Seventh. Two acres, more or less, constituting the El Roy gin.

Eighth. Lot No. 8, known as "gin lot."

Ninth. Leasehold interest in outlot No. 2, block No. 7, covering all gin stands, gin machinery, etc., located thereon.

At execution sale appellant purchased of the gin properties only the third and fourth items of the foregoing schedules, the property so acquired being commonly known as the "Sprinkle gin property."

2. From the stipulations and agreements of the parties we adopt the following:

"20. It was further agreed and admitted by the parties that, subsequent to the execution and delivery of the deeds of trust of the Austin National Bank and the Boatman's Bank, hereinbefore referred to, certain gin property located on said lots in the town of Sprinkle was destroyed by fire, and the sum of $3,306.48 was collected by the owners of the notes secured by liens on said property, as they were entitled to under the provisions of the deeds of trust; also that the sum of $180 was received by C. R. Laws, as rentals from the gin properties hereinbefore referred to, for the ginning season of 1916–1917, and the further sum of $75 was refunded to said C. R. Laws on account of insurance paid on said El Roy gin at the time same was sold to A. W. Johnson."

It was further agreed and admitted by the parties that—

"in the purchase of said property by the defendant H. H. Shear it was a part of said trade that he was to offer the composition in bankruptcy which was offered, and that $10,000 was deposited by him for said purpose in accordance with said agreement; that the amount of the proceeds of the sale of the El Roy gin, to wit, $8,500, and the $3,306.48 insurance money collected on the Sprinkle gin, less the amount set out in Exhibit B, aggregating $4,-046.61, was paid to the defendant Shear, as alleged in his first supplemental answer in this cause, and that said net amount, being $7,759.-

77, constituted a part of the $10,000, and was deposited by the defendant Shear for said composition; that of the said $10,000 the sum of $9,776.49 was used in effecting said composition, and the balance thereof, to wit, $223.51, is to be returned by the bankruptcy court to the defendant Shear."

[14] In the original opinion and judgment we held that appellant was entitled to redeem the properties purchased by him at execution sale, provided he discharged all liens and charges existing thereon, if done in accordance with the terms and conditions under which the trial court might authorize the acceptance of payment. It appearing without dispute that both the so-called mill and gin properties were incumbered by the liens and obligations of the Farmers' & Ginners' Cotton Oil Company, appellant claims that, upon satisfying these outstanding liens and charges, he should be subrogated to all liens which he has discharged, and upon this theory this would accord him the right to claim all the gin properties, though he only holds title to the one by purchase. This position would be a correct one, if it was shown that appellant, in order to protect his purchase, had to discharge a senior or paramount lien. The principle which lies at the very foundation of the doctrine of subrogation is "that the person seeking it must have paid the debt under the grave necessity to save himself a loss. The right is never accorded to a mere volunteer." Ætna Life Ins. Co. v. Middleport, 124 U. S. 534, 8 Sup. Ct. 625, 31 L. Ed. 537; Sheldon on Subrogation, § 240; 14 New Jersey Equity, 234. The gin properties individually owned by Hunter were, as has been shown, pledged to additionally secure the primary obligations of the mill company. Appellant, to redeem the mill properties, must discharge all liens and charges against these assets. When this is done the primary debt is paid, and this would operate, as we understand the rule, as an extinguishment of all liens resting against either the mill or the gin properties. Such being the operation of the rule, the fact that appellant's redemption of the properties actually purchased by him would likewise discharge the liens on the unacquired gin properties would not entitle him to succeed to this ownership by way of subrogation. We therefore hold, under the circumstances, that appellant's right of redemption is limited and restricted to those properties the legal title to which he acquired at execution sale.

[15] It appearing without controversy, under the stipulations of the parties, that a large part of the fund employed by the defendant Shear in effecting a composition with the general creditors of the Farmers' & Ginners' Cotton Oil Company, which inured to its benefit, was immediately derived from the sale and rental of certain gin properties, and the collection of insurance indemnities on account of the destruction of certain other

of said gin properties by fire, that the amount so realized from these two sources should be properly deducted from the amount to be paid by appellant in redemption.

The respective motions are overruled.

Motions overruled.

**On Appellees' Second Motion for Rehearing.**

In the concluding paragraph of an opinion rendered herein April 16, 1919, upon rehearing, we held that so much of the fund as was employed by the appellee H. H. Shear in effecting a composition with the general creditors of the Farmers' & Ginners' Cotton Oil Company, which was immediately derived from the sale of the Elroy gin, the rental upon the gin properties for the season of 1916–1917, and the insurance money collected on account of the destruction of what is referred to in the record as the "Sprinkle gin property," should be deducted from the amount to be paid by appellant in redemption of the several properties to which we have held his right of redemption extended.

[16] The conclusion was based upon the finding of the trial court, as we understood it, that appellee Shear, under an agreement with the Farmers' & Ginners' Cotton Oil Company, was to advance personally the $10,-000 necessary to effect a composition with the corporation's unsecured creditors. Upon further consideration of all the agreements of the parties relative to this undertaking, we are of the opinion that the agreement, whereby the appellee H. H. Shear was to make the advancement called for, was one primarily between the original lienholders and himself, rather than the corporation. Such being the case, the fact that a portion of the fund paid by him to effect the composition was realized from the sources in question would not entitle appellant to have these amounts deducted from the sum he would be required to pay to effect a redemption of those properties which his purchase actually covered, since none of the gin properties, save that known as the "Sprinkle gin property," was ever acquired. As to this particular property (the Sprinkle gin property), it is shown that the same was destroyed by fire, and that the sum of $3,306.48 was realized on account thereof. A careful search of the record, however, fails to disclose whether this property was destroyed before or after the execution sales at which appellant purchased. Proof of the date of that event will determine whether or not appellant will be entitled to a credit or allowance on account of this item.

To the extent that this opinion modifies the opinions heretofore filed, the motion is sustained, and in all other respects it is overruled.

BRADY, J., disqualified, and not sitting.