Lavina ROGERS, E.W. Cecil, Individually and as Executor for Michael Cecil, Norma Jean Rogers Choate, Robert Richard Rogers, K.W. Cecil, Jr., Linda K. Cecil Edwards, and John Campbell Rogers, Petitioners,

v.

RICANE ENTERPRISES, INC., Willbros Energy Services Company, Mobil Oil Corporation, Lea Refining Company, Pride Companies, L.P., Amoco Production Company, Richard Scurlock, Jerry I. Moritz, Calvin Ortego, Estate of J.C. Craft, and Brock Resources, Inc., Respondents.

No. D–3826.

Supreme Court of Texas.

Argued Jan. 18, 1994.

Decided June 15, 1994.

Rehearing Overruled Nov. 3, 1994.

Robert P. Baxter, Jr., Dallas, Richard L. Husen, Levelland, Dan Hook, Levelland, for petitioners.

Charles C. Self, Abilene, A. Andrew Gallo, Houston, Robert E. Motsenbocker, Odessa, S. Clinton Nix, Abilene, Dennis R. Burrows, Patrick Helton, Lubbock, C. Medford Owen, Jr., C.H. (Hal) Brockett, Jr., Tom Scott, Eric L. Lindstrom, Midland, Thomas C. McClellan, Dallas, Dave Caddell, Abilene, Warren G. Tabor, Jr., Levelland, John S. Lowe, Walter G. Pettey, III, Stephen G. Gleboff, Dallas, for respondents.

ENOCH, Justice, delivered the opinion of the Court in which PHILLIPS, Chief Justice, and GONZALEZ, HECHT, and CORNYN, Justices, join.

This case involves a trespass to try title action among various parties asserting ownership to a partial assignment of an oil and gas lease. The trial court rendered judgment that the Petitioners take nothing and the court of appeals affirmed, concluding that the assignee had abandoned the purpose of the oil and gas lease in question. 852 S.W.2d 751. We reverse the judgment of the court of appeals.

## I.

The trespass action began when Lavina Rogers and others (Rogers), claiming as shareholders of defunct Western Drilling Company (Western), sued Ricane Enterprises and others (Ricane) to recover possession of a working interest under a partial assignment of a larger oil and gas leasehold estate. In May 1937, Carrie Slaughter Dean, lessor, entered into an oil and gas lease with lessee P.N. Wiggins. The lease covered approximately 7,893 acres (base lease). The lease contained a habendum clause providing that Wiggins was "TO HAVE AND TO HOLD [the 7,893 acres] ... for a term of ten (10) years from [May 31, 1937,] ... the primary term, and as long as oil and gas ... is produced...." The lease also provided that if the leased premises "shall hereafter be owned in the severalty or in separate tracts, the premises, nevertheless shall be developed ... as one lease...." The lessee achieved production within the primary term and subsequently assigned the base lease to Superior Oil Company ("Superior").

In June of 1949, Superior assigned 329.3 acres of the base lease, on which there was no production, to Western. The assignment noted that the conveyance would terminate and revert to Superior unless Western commenced actual drilling within thirty days. Western also agreed to assume all express and implied base lease obligations. Western immediately drilled and completed a well. The well was marginally productive and ceased production in July of 1961. Western and its shareholders did not drill any wells on the tract from 1961 to the present.

In August of 1960, before the well ceased production, Western's president, E.P. Campbell, signing in his personal capacity, conveyed all his rights to the 329.3 acres to the Dakota Company, Inc. In return, Dakota gave Campbell a promissory note and deed of trust which Campbell transferred to Union Bancredit Corporation. Union Bancredit purported to foreclose on the 329.3 acres when Dakota defaulted on the note. Union Bancredit subsequently assigned the 329.3 acres to Harry Allred, a majority shareholder of the Torreyana Oil Corporation. Torreyana successfully completed a new producing well on the property in October 1979 and is a part of the Ricane group.[1]

Campbell died in 1961, and in 1965 the State of Texas forfeited Western's corporate charter due to nonpayment of franchise taxes. In 1984, Rogers brought a trespass to try title action against Ricane, seeking to recover possession of the working interest under the partial assignment of the base lease. They also sought damages from various members of the Ricane group for conversion of oil and casinghead gas produced or purchased from the properties.

The trial court granted summary judgment in Ricane's favor, finding that the lease automatically terminated because: 1) of cessation of use; 2) the property was abandoned; 3) of laches; and, 4) of the statute of limitations. The court of appeals affirmed on the cessation of use theory. 775 S.W.2d 391. This Court concluded that the assignment language in question created a covenant, not a condition, and that breach of that covenant could not have resulted in automatic termination of Western's rights. *See Rogers v. Ricane Enterprises, Inc.*, 772 S.W.2d 76 (Tex.1989) (*Ricane I*). Thus, we reversed the summary judgment and remanded the case for trial on the merits. *Id.*

On retrial, the trial court rendered a take nothing judgment in the trespass to try title and conversion claims. The court of appeals affirmed after concluding that the lease had terminated based on the jury's finding of abandonment of purpose. 852 S.W.2d 751. Rogers argues that the court of appeals erred in its holding because this Court in *Ricane I* held, as a matter of law, that the assignment had not terminated, thereby implicitly rejecting the *Davis* doctrine. *See Texas Co. v. Davis*, 113 Tex. 321, 254 S.W. 304 (1923) (calling for automatic termination of lease after the purpose of lease has ceased or has been abandoned). Ricane responds that the assignment automatically terminated under the terms of the assignment instrument itself or pursuant to the *Davis* doctrine.

## II.

First, we address whether the assignment terminates pursuant to the terms of the assignment instrument. In *Ricane I*, this Court specifically addressed paragraphs 1 and 2 of the assignment. *Ricane I*, 772 S.W.2d at 79. The parties acknowledged that the provisions of paragraph 1 had been satisfied, and we held that a violation of paragraph 2 would not result in automatic termination of the property interest. *Id.*

In this appeal, we are now pointed to paragraphs 5 and 7 of the assignment instrument. They state:

### 5.

In the event that production of oil, gas or other hydrocarbon substances is developed on the above described leased premises by Western, and Western desires to abandon or cease operating the same, Western shall

---

1. In 1983 Harry Allred assigned his interest to Meyer–Moritz & Company. Meyer–Moritz sold part of its interest to Argonaut Energy Corp. (now Brock Resources, Inc.) and the remainder to Cordova Resources, Inc. (now Willbros Energy Services Co.), both of which are part of the Ricane group as well.

notify Superior in writing of such desire, and Superior may, at its election, require Western to transfer and assign to Superior [the holder of the base lease] or to its nominee all of Western's right, title and interest inland[sic] to said lease, together with the well or wells located thereon and together with such equipment used in connection therewith which Superior may desire to acquire.

.    .    .    .

### 7.

Upon termination of the rights of Western hereunder and/or with respect to the above described lease, as herein and in said lease expressly provided, or otherwise, Western shall deliver to Superior upon demand, a good and sufficient quit-claim deed and release. Any delay, failure or refusal on thepart [sic] of Western to deliver any such quit-claim and release shall in no way prevent such rights from terminating, and reverting to and revesting in Superior as herein expressly provided and contemplated. . . .

Ricane argues that by reading paragraphs 5 and 7 together, it becomes evident that the assignment terminated because of Western's failure to transfer the assigned premises back to the holder of the base lease.

■ We disagree. Paragraph 7 is only triggered upon failure of some other provision leading to termination of Western's rights. Western met the only condition in the assignment which could lead to automatic termination of the assignment by drilling an initial well within thirty days. *Ricane I,* 772 S.W.2d at 79; *see also Colby v. Sun Oil Co.,* 288 S.W.2d 221, 225 (Tex.Civ.App.—Galveston 1956, writ ref'd n.r.e.) (noting that the general rule that mineral leases are construed more strongly against the lessee and in favor of the lessor does not apply to the construction of forfeiture provisions). The assignment did not automatically terminate under its own terms.

**2.** Black's Law Dictionary 554 (5th ed. 1979) defines a determinable fee as a property interest which is burdened by a provision in the conveyance providing for automatic expiration of the estate upon occurrence of an operative event, an event which may or may not occur. *See also Big*

### III.

Next, we address whether *Davis,* 254 S.W. 304, applies here. In *Davis,* a lease contained a clause which made the lease void, leading to forfeiture, if drilling did not commence within two years. *Id.* 254 S.W. at 304–05. The lease contained no stated term for its existence, but provided that the conveyance was made for "the purpose of drilling, mining and operating for minerals," and that in the event oil or other minerals were discovered, the conveyance would be "in full force and effect for twenty-five years from the time of the discovery of such product, and *as much longer as* oil, water, gas or other minerals can be produced in paying quantities." *Id.* at 305 (emphasis added). Drilling began within two years, but all production on the property ceased and all drilling equipment and machinery were subsequently removed from the premises during the twenty-five year period referenced in the lease. This caused Davis, the lessors' assignee, to sue Texas Company, the lessee's assignee, for recovery of the lease on the basis that the condition of drilling had not been satisfied. *Id.* at 306.

This Court concluded that: 1) the lease in question conveyed a determinable fee, and 2) the purpose of the lease was the production of oil and gas.[2] *Id.* at 306. The Court noted that once the drilling condition was met, title to the minerals vested, but only for the purpose specified—for the exploration, development and production of minerals. When the lessee ceased using the land for the stated purpose, the estate instantly terminated. *Id.* at 307–308. *Davis* stands, therefore, for the proposition of law that, if the expressed purpose of the lease is the production of minerals, and the grantee "entirely and permanently stopped and abandoned the exploration and development" of the property in question, then the estate terminates at once and title reverts to the grantor. *Id.* at 309.

*Lake Oil Co. v. Reagan County,* 217 S.W.2d 171, 173 (Tex.Civ.App.—El Paso 1948, error ref'd) (noting that a determinable fee is one that may never be terminated or that may be terminated in accordance with the law under which the conveyance was created).

This Court elaborated on *Davis* in *W.T. Waggoner Estate v. Sigler Oil Co.*, 118 Tex. 509, 19 S.W.2d 27, 29 (1929). Noting that like the lease in *Davis*, the Waggoner lease contained a clause that limited the duration of the lease to "as much longer as oil or gas was produced," this Court expressed concern that there not be any confusion between the theories of abandonment of title and of *cessation of use* of an oil and gas lease recognized in *Davis*. *Id.* at 30–32. These are two separate doctrines. Although we do not recognize abandonment of title in Texas, *see Ricane I*, 772 S.W.2d at 80, the *Davis* doctrine has been repeatedly affirmed. *See Fox v. Thoreson*, 398 S.W.2d 88, 91 (Tex.1966); *Chandler v. Drummet*, 557 S.W.2d 313, 315–16 (Tex.Civ.App.—Houston [1st Dist.] 1977, writ ref'd n.r.e.); *see also Mon–Tex Corp. v. Poteet*, 118 Tex. 546, 19 S.W.2d 32 (1929).

■ Contrary to Rogers's claim, in *Ricane I* we did not implicitly overrule *Davis*.[3] The assignment in this case does not, by its express terms, specify a purpose for the assignment and does not contain any language limiting the duration of the assignment to "as long as" oil and gas is produced. Therefore, *Davis* does not control, and the jury's answer regarding abandonment of purpose is immaterial.

■ Ricane, alternatively, points out that the base lease contains determinable fee language and the assignment incorporates the base lease obligations. Resort to the provisions of the base lease, though, does not lead to automatic termination of the assigned portion upon cessation of production. The base lease contains a clause stating that if "the leased premises shall hereafter be owned in severalty or in separate tracts, the premises, nevertheless, shall be developed and operated as a single lease...." Consequently, production from part of the lease saves the entire base lease, including the assigned portion. Thus, the production on the other parts of the base lease would have saved the

assignment and prevented its termination. *See e.g., Shuttle Oil Corp. v. Hamon*, 477 S.W.2d 701 (Tex.Civ.App.—Beaumont 1972, writ ref'd n.r.e.); *Dacamara v. Binney*, 146 S.W.2d 440 (Tex.Civ.App.—San Antonio 1940, writ dism'd judgmt cor.). The assignment instrument is what governs the rights of Rogers and Ricane.

■ Ricane, additionally however, argues that there is an *implied* determinable fee in the assignment. We decline to infer such language from the assignment instrument. *See Ricane I*, 772 S.W.2d at 79 (the language used by the parties ... will not be held to impose a special limitation on the grant unless it is clear and precise and so unequivocal that it can reasonably be given no other meaning); *see also Waggoner*, 19 S.W.2d at 32 (noting that courts should not find that a lease has been forfeited or terminated upon breach of an implied obligation); *see e.g., Foster v. L.M.S. Dev. Co.*, 346 S.W.2d 387, 394 (Tex.Civ.App.—Dallas 1961, writ ref'd n.r.e.) (stating that a promise of an obligee will be construed as a covenant unless an intention to create a conditional estate is clearly and unequivocally revealed by the language of the instrument).

■ Even if we were to imply a drilling purpose in the assignment, we reject the notion that automatic termination would be the resulting remedy. The appropriate remedy would be an action for breach of that implied covenant, or a conditional decree of cancellation allowing the parties to fulfill the purpose of the assignment by drilling to avoid losing the assignment. *See Ricane I*, 772 S.W.2d at 79; *Waggoner*, 19 S.W.2d at 29–32. *Waggoner* specifically states that the:

> usual remedy for breach of lessee's implied covenant for reasonable development of oil and gas is an action for damages, though, under extraordinary circumstances—where there can be no other adequate relief—a court of equity will entertain an

3. Rogers, alternatively, has argued that in *Dallas Power & Light Co. v. Cleghorn*, 623 S.W.2d 310 (Tex.1981), this Court limited the *Davis* doctrine to unusual or "no term" leases that are still in the primary or exploratory terms.

That case did not limit the doctrine as Rogers claims. The leases in that case provided for

delay rental payments in lieu of production. *Id.* 254 S.W. at 311. Consequently, this Court concluded that the leases in question expressed an intent contrary to abandonment through cessation of production. *Id.* Thus, *Davis* was not implicated.

action to cancel the lease in whole or in part.

*Id.* 19 S.W.2d at 29; *see also* Ernest E. Smith & Jacqueline Lang Weaver, 1 TEXAS LAW OF OIL AND GAS 254–55 (1993) (discussing remedies for breach of implied covenant of reasonable development and noting that Texas courts have consistently followed *Waggoner* and generally refuse to grant lease cancellation). Furthermore, the proper party to bring such an action would be Superior, the assignor. We need not further elaborate on Superior's entitlement to such remedies because it is not a party to the present action.

### IV.

Having determined that *Davis* does not control in this case and that the assignment did not automatically terminate by its own terms, we now determine who prevails under trespass to try title principles. Because both parties claim they ultimately derived their title from Western, the relevant question is whose title is superior—that of Rogers or that of Ricane.

A trespass to try title action is a procedure by which claims to title or the right of possession may be adjudicated. *Yoast v. Yoast*, 649 S.W.2d 289, 292 (Tex. 1983). To recover in a trespass to try title action, the plaintiff must recover upon the strength of his own title. *Hunt v. Heaton*, 643 S.W.2d 677, 679 (Tex.1982); *Land v. Turner*, 377 S.W.2d 181, 183 (Tex.1964). The plaintiff may recover (1) by proving a regular chain of conveyances from the sovereign, (2) by proving a superior title out of a common source, (3) by proving title by limitations, or (4) by proving prior possession, and that the possession has not been abandoned. *Turner*, 377 S.W.2d at 183.

Ricane concedes that the second means of establishing title is at issue here. Generally by this means, Rogers, as the plaintiff, may prove a prima facie case by connecting its title and Ricane's title through complete chains of title to the common source and then by showing that its (Rogers's) title is superior. *Adamson v. Doornbos*, 587 S.W.2d 445, 447 (Tex.Civ.App.—Beaumont 1979, no writ) (*citing Jones v. Mid–State Homes, Inc.*, 163 Tex. 229, 356 S.W.2d 923, 924 (1962)). However, because Ricane has asserted that its title derives from the same source as Rogers's title, Rogers, as plaintiff, need only demonstrate good title coming from that common source to meet its burden of proof. *See United States v. Denby*, 522 F.2d 1358, 1362 (5th Cir.1975).

Rogers claims to have obtained the assets of Western, including the property interest in question, by virtue of its status as the shareholders of Western. To prevail, Rogers must show that, at the time Western lost its corporate charter, Western had good title to the land. Additionally, because the forfeiture of Western's charter to the State caused Western to cease being a legal entity, we must determine what interest, if any, Western's shareholders had in the corporation's assets, including the leasehold interest.

In Question 1 the jury found that Western, "at all times since at least 1960 and ... at the present time [has been] the owner of all or part of the title."[4] When Western's charter was forfeited, a lien on Western's property was available to the State to satisfy Western's liability to the State. *See* TEX.CIV. STAT.ANN. art. 1302–5.07 (Vernon 1961). However, there is no evidence that the State executed on that lien with respect to the assignment. Rogers, as Western shareholders, held equitable title to the property owned by Western in trust for Western's creditors. *See Humble Oil & Refining Co. v. Blankenburg*, 149 Tex. 498, 235 S.W.2d 891, 893 (1951); *Houston v. Shear*, 210 S.W. 976, 981 (Tex.Civ.App.—Austin 1919, writ dism'd).

It appears that Keith W. Cecil, Jr., a director and shareholder of Western, either

---

4. We note that in Question 3 the jury found that since 1960, Western owned only a one-third fractional working interest.

Where the plaintiffs in a trespass to try title case show title to an undivided interest in property, they are entitled to judgment as to the entire tract, unless the defendant shows title to some interest in the land or a right to possession of the land. *Steddum v. Kirby Lumber Co.*, 110 Tex. 513, 221 S.W. 920, 922 (1920). Because Ricane has failed to show valid title to any part of the assignment, as discussed below, this finding by the jury is immaterial.

was appointed or volunteered to wind up Western's affairs. He testified that his goal was to pay off Western's creditors. He further testified that Western had difficulty paying off its creditors after E.P. Campbell's death and after the State's forfeiture proceedings. But, neither he nor anyone else testified as to the fate of the property interest following forfeiture of Western's charter. Ricane relies on this insolvency to support its claim that any interest Western's shareholders may have had with regard to the assignment disappeared following the forfeiture of Western's charter. However, there has been no showing that a transfer of title occurred. Western's alleged insolvency is insufficient to defeat the title claimed by Western's shareholders.[5]

Ricane responds that Campbell's 1960 transfer to Dakota and its subsequent transferees was binding on Western, thereby making Ricane's title superior to Western's shareholders' title. *See Curdy v. Stafford,* 88 Tex. 120, 30 S.W. 551, 552 (1895) (noting that absent special provisions in the conveyance that defeats it, earlier title emanating from the common source is the better title and is given prevailing effect). In determining whether Campbell transferred Western's property interest to Dakota, we must consider the instrument in its entirety. *See Cook v. Smith,* 107 Tex. 119, 174 S.W. 1094, 1095 (Tex.1915).

█ The deed stated that E.P. Campbell granted, conveyed, sold, assigned, and transferred to Dakota "all of the right title and interest . . . as conveyed to [him] by Assignments of record [including conveyance of] all of [his] right, title and interest . . . in [the base lease] . . . insofar as said lease covers the . . . 329.3 acres. . . . subject to the exceptions, reservations and provisions . . . stated, but all without warranty of any kind, either expressed or implied." This is the essence of a quitclaim deed. *See* BLACK'S LAW DICTIONARY 1126 (5th ed. 1979) (a quitclaim deed is a deed of conveyance intending to pass any title, interest or claim of the grantor, but not professing that such title is valid, nor containing any warranty or covenants for title); *Porter v. Wilson,* 389 S.W.2d 650, 655–56 (Tex.1965); *Cook,* 174 S.W. at 1095–96. A quitclaim deed is not a conveyance or a muniment of title. *Adamson,* 587 S.W.2d at 447–48. By itself, it does not establish any title in those holding the deed, but merely passes the interest of the grantor in the property. *Id.* Campbell gave Dakota only whatever title he individually had. Having no title to the property interest in question, Campbell passed no title.[6]

█ Ricane urges, however, a "reverse alter ego doctrine" theory to hold Western liable for Campbell's conveyance to Dakota. *See e.g., Zahra Spiritual Trust v. United States,* 910 F.2d 240 (5th Cir.1990) (applying Texas law and recognizing reverse alter ego theory). Because Campbell executed the instrument in his personal capacity, and the instrument itself does not reflect that Campbell purports to act on behalf of Western, the reverse alter ego theory does not apply. Alternatively, Ricane claims that it has title because the jury found that Western ratified Campbell's act, either through inaction or acquiescence. However, there is no evidence in support of the jury's finding. Even if Western had actual or constructive knowledge of Campbell's assignment to Dakota,

---

5. Some members of the Rogers group claim rights to the assignment through inheritance of stock held by Campbell rather than by virtue of being original shareholders. Had the 1960 instrument Campbell executed purported to warrant title, then Campbell's conduct might estop his heirs from asserting claims against Ricane as grantees. *See Clark v. Gauntt,* 138 Tex. 558, 161 S.W.2d 270, 271–72 (1942). However, as discussed below, because Campbell's conveyance was only by quitclaim and transferred only whatever "right, title and interest" *he* had in 1960, Campbell's heirs have a claim to their proportionate share of the land in question. *See Roberts v. Corbett,* 265 S.W.2d 127 (Tex.Civ.App.—Galveston 1954, writ ref'd) (noting that doctrine of after-acquired title does not apply to quitclaim deed).

6. Because of the language in the deed from Campbell to Dakota, Ricane urged in the trial court that there was a lost deed transferring title to the assignment from Western to Campbell. Question 12 asked the jury whether it found "that it is more reasonable than not that there is a lost deed between Western Drilling Company, Inc. as grantor and E.P. Campbell as grantor pertaining to the Subject Property?" The jury answered: "No."

Campbell executed the instrument in his individual capacity and the instrument itself does not purport to convey any interest belonging to Western. There is no ratification here.

■ Finally, Ricane claims to have obtained title by virtue of division orders executed by Superior, holder of the base lease, purporting to recognize Ricane's interest in the assigned portion of the lease. The fact that Superior purportedly recognized that Ricane had an interest in the lease by its division orders does not transfer title of the lease to Ricane. While a division order can create a contractual relationship, it does not transfer title. *See Chicago Corp. v. Wall,* 156 Tex. 217, 293 S.W.2d 844, 846–47 (1956); *Thompson v. Thompson,* 149 Tex. 632, 236 S.W.2d 779, 786 (1951); *Padgett v. Padgett,* 309 S.W.2d 262, 266–67 (Tex.Civ.App.—Austin 1957, writ ref'd n.r.e.). The division orders do not replace or invalidate the original assignment. *See e.g., Gavenda v. Strata Energy, Inc.,* 705 S.W.2d 690, 691 (Tex.1986); *Williams v. Baker Exploration Co.,* 767 S.W.2d 193, 196 (Tex.App.—Waco 1989, writ denied). Ricane cannot establish title by means of the division orders.

As part of its argument, Ricane claims that Superior regained title to the assigned portion of the lease because it exercised its right of termination through two letters sent in 1966 noting Western's cessation of production and demanding a reassignment. We have already noted that the assignment did not terminate automatically. Regardless of the right to demand reassignment, Superior had to sue to enforce any rights it had. This it has not done.

With Rogers having established its title through Western, and Ricane having failed to overcome Rogers's claim with proof of superior title, title quiets in the Rogers group.

For the reasons stated, we reverse the judgment of the court of appeals and render judgment quieting title in Rogers. Further, we remand to the court of appeals for consideration of the points it did not reach, including the conversion issues.

HIGHTOWER, Justice, joined by DOGGETT, GAMMAGE and SPECTOR, Justices, dissenting.

The court concludes that the rule of *Texas Co. v. Davis,* 113 Tex. 321, 254 S.W. 304 (1923), only applies if a lease states an express purpose of production of oil and gas and if there is a clause limiting duration of the lease for as long as oil and gas is produced. In discussing the manner in which oil and gas leases transfer title and abandonment of purpose, *Davis* stated,

> Much the same practical results are obtained whether the mineral estate conveyed is regarded as determinable or is regarded as held on condition subsequent, where there has been a failure of the lessee to perform the obligations, express or implied, which are essential to the accomplishment of the purpose of the grant. Our object is to announce a rule which is truly consonant with the real intent of the contracting parties.

> We are convinced: First, that Underwood and his assigns took only a determinable fee ...; and, second, that abandonment of the purpose for which Underwood and his assigns were invested with their title was necessarily fatal to the maintenance of the suit....

254 S.W. at 309. The court translates the effort to understand the purpose of the lease into a requirement that the lease expressly state the purpose. This is inconsistent with the well-settled principle that a contract shall be construed as a whole and in light of the purposes and objects for which it was made. *E.g., id.,* 254 S.W. at 308 (quoting with approval the "irrefutable logic" of *Parish Fork Oil Co. v. Bridgewater Gas Co.,* 51 W.Va. 583, 42 S.E. 655 (1902) (citing *Ray v. Gas Co.,* 138 Pa. 576, 20 A. 1065 (1891))). The court does not attempt this analysis, relying instead on the proposition that obligations should not be implied into a contract, particularly in opposition to express language in the contract. This argument misses the point; although there is no express language stating what the purpose of the contract is, the contract still has a purpose. If that purpose is the production of oil and gas, then a complete failure to pursue that purpose—"not a

partial use, nor a negligent use, nor an imperfect use, but cessation of use," *Waggoner Estate v. Sigler Oil Co.*, 118 Tex. 509, 19 S.W.2d 27, 29 (1929)—is an abandonment of the purpose, which terminates the estate. *Id.* Because I believe that the purpose of this contract was for exploration, development, and production of oil, gas, and minerals, and because the jury determined that the purpose of the assignment was abandoned, I would apply *Davis* to conclude that the assignment automatically terminated. Thus, I would affirm the judgment of the trial court in favor of Ricane.