**Opinion filed August 18, 2011**



In The

# Eleventh Court of Appeals

_____

## No. 11-09-00250-CV

_____

## SUSAN G. REID AND GERALD R. REID, Appellants

## V.

## CHARLES HUTTON, LAFREITA HUTTON, GARY HUTTON, AND JIMMY HUTTON, Appellees

On Appeal from the 91st District Court

Eastland County, Texas

Trial Court Cause No. CV-07-40750

## M E M O R A N D U M   O P I N I O N

Appellees Charles Hutton and his wife, Lafreita Hutton, and his sons, Gary Hutton and Jimmy Hutton, filed this suit claiming title to an area in the southwest corner of the adjacent tract owned by appellants, Susan G. Reid and her husband, Gerald R. Reid. The Huttons' claim was based solely on the ten-year statute of limitations. TEX. CIV. PRAC. & REM. CODE ANN. § 16.026(a) (Vernon 2002). After a bench trial in February 2009, the trial court rendered judgment for the Huttons.

The requirements of the statute were not met. It is unclear from the petition, the evidence, and the judgment where all of the boundaries of the claimed area are. Before issuing its ruling, the trial court stated on the record that it did not know whether a judgment could be crafted unless or until a survey of the area was made. The Huttons testified that they were claiming about one-third or one-half an acre. The trial court also was concerned about whether the requirement of notice to the record holder had been met. We hold that it was not. The Huttons' evidence was legally insufficient to show open or visible acts manifesting an intention to claim the land adversely. *See Orsborn v. Deep Rock Oil Corp.*, 267 S.W.2d 781, 787-88 (Tex. 1954). We reverse and render judgment for the Reids.

*Background Facts*

The Huttons acquired a 326.285-acre tract of land from B. E. Hanson and his wife, LaRue Hanson, by warranty deed dated March 12, 1985. In April 2005, the Reids acquired the adjoining tract of 239.94 acres by warranty deed from Martha Julie Gilbert. Both deeds contain detailed descriptions by metes and bounds of the respective tracts. The Huttons acknowledged at trial and in their brief to this court that the area they claim is contained within the description of the tract in Gilbert's deed to the Reids.

The parties do not live on their respective tracts. The Reids live in Spicewood, and the Huttons live in Weatherford.

The testimony of the Huttons concerning the area claimed was very confusing. Often they were referring to exhibits, and it was impossible to tell which exhibit or to what part of an exhibit they were discussing. The Huttons stipulated during trial that there was no metes and bounds description or survey of the area claimed. Nor did they introduce a drawing of the area as an exhibit. Much of their testimony concerned a gate used by the Huttons on the Reids' southern boundary for access from county road 358 and the Huttons' and their hunters' use of an abandoned railroad right-of-way as a road to a gate in the boundary fence between the respective tracts of the Huttons and the Reids. The Huttons offered no complete and clear testimony as to how the area was enclosed except to say that it was enclosed at the time they purchased their property.[1]

---

[1]There is a discussion of a gate to the Reids' property in pages 32 and 33 of the record, but we are unable to tell from the record where that gate was located.

There is an abandoned railroad right-of-way located across the southwest corner of the Reids' tract that the Huttons claim they have used as the primary access road to their 326.285 acres for over ten years. In their petition, the Huttons claimed that they maintained a fence and gate that was actually on the Reids' property. We assume they were referring to the southern fence on the Reids' property that parallels county road 358.

Charles Hutton testified that they used the gate on the Reids' property on the county road and then drove northwest on the abandoned railroad right-of-way to go to their land where there was another gate. When asked what was across the railroad right-of-way before Susan Reid removed the existing boundary fence and then built a new boundary fence (according to the Reids' survey), Charles testified that there was a metal gate that was there when they purchased the property. Both Charles and Gary Hutton testified that the fence and gate separating the respective tracts were in existence when they purchased their tract of land. That fence and gate and the new fence built by the Reids were the west boundary of the Reids' tract and the east boundary of the Huttons' tract.

Before the Reids built a new boundary fence between their tract and the Huttons' tract, there was a fire in 2006 that burned the old boundary fence posts. Charles Hutton admitted that, after the fire, Susan Reid asked him to share the cost of a new fence between them. He declined to do so because he did not want to pay for a fence that kept him from using the gate on the Reids' property to access county road 358. When the Reids built the new boundary fence without a gate to the Huttons' tract, Charles Hutton and his son, Gary, took down a portion of that fence even though Charles admitted that the fence built by the Reids went down the boundary survey line.

Charles Hutton was asked if, after the fire had damaged the boundary fence, there was "a problem with the condition of the fence that would allow [his] cattle to roam off [his] property." He said that there was and that they put their cattle on another piece of property to the west. His attorney then asked if he had ever seen the Reids' cattle "out there." Charles Hutton replied that he had seen the Reids' cattle "out there" one time. In the context of that portion of his testimony, it appears that Charles Hutton was talking about the southwest corner of the Reids' property.

The southern border of the Huttons' tract also runs along county road 358. Gary Hutton acknowledged that other entrances could have been built on their land. Charles Hutton testified that there was another entrance to their property from county road 358 that was "in the center"

3

"[o]n the south side, off the county road" and a second entrance that was at the southwest end of their property. He described the fence line and "the gate entrance in the middle of the south side of [his] property."[2]

Charles Hutton acknowledged that the fence and gate on the Reids' land and the boundary fence and gate between the respective tracts were in existence when they bought their 326.285-acre tract. He testified that purchasers of rock from the rock quarry on their land used the two gates to drive on the railroad right-of-way to their land. He said that the rock was used to build Lake Proctor in Comanche County which was completed long before the Huttons bought their tract. After they bought their tract, the Huttons continued to sell remnants from the rock quarry, and the railroad right-of-way road was used to haul the rock.

Susan Reid testified that she contacted the Huttons shortly after the Reids purchased their property and had it surveyed. She wanted to explore with her neighbors a joint fencing of the boundaries. According to her, all the fences, including cross-fences, were in terrible shape. When she visited with the Huttons, she told them that she knew they were using part of her property to get to their land, but they needed to change to another entrance because she planned to eliminate the gate in the fence going into their land. She said that, although she advised the Huttons of her intent to replace the old boundary fence between their respective tracts, she gave the Huttons permission to continue crossing her land until her fencing was completed.

According to Susan Reid, Gary Hutton came to see her and told her that the Huttons would pay her $500 for the area with the railroad right-of-way road. Susan said that Gary based the offer on what the Reids had paid for their tract. She also said that Gary kept telling her that he had gone across the property for many years, and they hoped the Reids "wouldn't not fence them in." Later, Gary was asked by his counsel, "Did you say anything about making an offer to her to pay the cost of a survey, or closing costs, or her attorney's fees *to buy that corner*?" His answer was, "Well, I had said I would cover those costs." Also, in their answer to Request for Admission No. 6 of the interrogatories, the Huttons admitted that one or more of them had "offered to purchase the disputed one-half acre, more or less, from [the Reids] prior to the fencing dispute." The fencing dispute occurred after Susan Reid built the new boundary fence.

---

[2]It appears from the title opinion dated January 22, 1985, from Turner, Seaberry & Warford, that the middle of the south side of the Huttons' property would be between the southeast quarter of section 22 and the southwest quarter of section 19.

Susan Reid testified that neither Charles Hutton nor Gary Hutton ever told her that they claimed ownership of part of her land before they filed suit. Susan said she made it clear to the Huttons at all times that the Reids were going to build the new fence down the survey line between the two properties.

Charles Hutton admitted that he never told Susan Reid that he claimed ownership of a part of her land. Charles testified that he started claiming ownership of the area when he "first started going through it 24 years ago." When asked to whom he stated his claim, Charles answered, "The people that I bought the property from." Gary Hutton testified that the first time he gave the Reids formal notice that the Huttons were claiming the area was when they talked to their lawyer in Weatherford.

Susan's husband, Gerald Reid, testified that when Gary Hutton met with Susan to discuss the Reids' southwest corner, he and Charles Hutton were there but were discussing an old tractor on the Reids' tract. Afterwards, "Susan relayed to [her husband] that there was an offer of $500 for the property, a willingness to pay for any re-survey and/or plat, or local fees to get the property transferred into their title." Gerald stated that the Huttons never claimed to own the property, but it was his impression that the Huttons had used that entrance over the years by permission. Susan testified that she had a key from Gilbert to the gate into the Reids' property from county road 358 and that she had gone through that gate several times.

After a bench trial, the trial court rendered judgment for the Huttons. However, the trial court had difficulty in identifying the boundaries of the property that the Huttons claimed they owned by adverse possession. The trial court attempted to solve that problem by attaching copies of three exhibits to the judgment. The attached exhibits do not provide a  sufficient description of the claimed area. From the record, this court is unable to tell the northern boundary or boundaries of the claimed area. Nor are we able to tell how far to the east on the Reids' land the Huttons were claiming.

*Requirements of a Trespass to Try Title Suit*

When a party claims title by adverse possession, the claim may be resolved only in a statutory trespass to try title action. *Martin v. Amerman*, 133 S.W.3d 262, 267 (Tex. 2004); *Ruiz v. Stewart Mineral Corp.*, 202 S.W.3d 242, 247 (Tex. App.—Tyler 2006, pet. denied); *Ely v. Briley,* 959 S.W.2d 723, 727 (Tex. App.—Austin 1998, no pet.). A trespass to try title action is a procedure by which rival claims to title or right of possession may be adjudicated.

5

TEX. PROP. CODE ANN. § 22.001(a) (Vernon 2000); *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 755 (Tex. 2003); *Ruiz*, 202 S.W.3d at 247. Although the Huttons' petition did not state that the suit was a trespass to try title action, we will assume that it was.

Adverse possession is one method of proving title in a trespass to try title action. *Rogers v. Ricane Enters., Inc.*, 884 S.W.2d 763, 768 (Tex. 1994). To recover in a trespass to try title action, the plaintiff must recover upon the strength of his own title. *Id*. One seeking to establish title to land by virtue of the statute of limitations has the burden of proving every fact essential to that claim by a preponderance of the evidence. *Rhodes v. Cahill*, 802 S.W.2d 643, 645 (Tex. 1990). And, inferences are never indulged in the adverse claimant's favor. *Bywaters v. Gannon*, 686 S.W.2d 593, 595 (Tex. 1985).

Adverse possession is "an actual and visible appropriation of real property, commenced and continued under a claim of right that is inconsistent with and is hostile to the claim of another person" throughout the statutory period. TEX. CIV. PRAC. & REM. CODE ANN. § 16.021(1) (Vernon 2002). The statute requires that such possession be "inconsistent with" and "hostile to" the claims of all others. *Tran v. Macha*, 213 S.W.3d 913, 914 (Tex. 2006). The adverse possession claimant also has the burden of identifying the tract that he claims; judgment for the record owner is proper if the claimant fails to do so. *Coleman v. Waddell*, 249 S.W.2d 912, 913 (Tex. 1952); *Julien v. Baker*, 758 S.W.2d 873, 877 (Tex. App.—Houston [14th Dist.] 1988, pet. denied).

*Analysis*

In Issues 2, 4, and 5, the Reids argue that the trial court erred in rendering judgment for the Huttons because (a) the Huttons failed to meet the burden of proof necessary to sustain an adverse possession claim under the ten-year statute of limitations, (b) the evidence presented by the Huttons was legally insufficient to support the judgment, and (c) the evidence presented by the Huttons was factually insufficient to support the judgment.

In their reply brief, the Huttons first assert that they claimed "[t]he Southeast corner, comprised of approximately one-half (1/2) acre (the 'Disputed Property'), is the subject of this appeal." The record reference cited for a description of the claimed area is a statement by the Reids' counsel to the court, at the beginning of the trial, asking the court to take notice that "there is a legal description of the area that's in dispute. It's generally as a tract of a half acre, more or less." But it is apparent that counsel meant to say that there was *not* a legal description

of the claimed area because his next sentence advised the court, that "There is no metes and bounds description of that property, and there is insufficient description of that property for the court to enter a judgment in this matter." From the beginning of the trial, the Reids have taken the position that the area claimed was insufficiently described.

It is evident from the record that the claimed area was in the southwest corner of the Reids' property, which was next to the southeast corner of the Huttons' property. Although two boundaries were identified – the Reids' southern fence along county road 358 and the fence between the respective tracts – the remaining boundary or boundaries were not.

Charles Hutton testified that the claimed area was "[a] very small piece of land," about "a third to half an acre." In their brief, the Huttons point to the Reids' Exhibits Nos. 6, 7, 11, and 12 as showing the disputed area. One can see the old railroad right-of-way line on those exhibits, but the only discussion of that line by the Huttons was Charles's testimony that the line was the abandoned railroad right-of-way that crossed the county road and went into the Huttons' property. However, there was no evidence or testimony as to how much property on the north side of the right-of-way road the Huttons were claiming or how far to the east of the Reids' gate to county road 358 they were claiming.

Susan Reid did testify that there was an old fence near the right-of-way road that their predecessors in title probably erected to keep cattle off the railroad, but that "it was very old and it was not much of a fence." The only other reference to a fence north and parallel to the old railroad right-of-way were questions to Gary Hutton concerning how old the fence was. He also testified that the fence was old and had been there a long time. He said that he had repaired it at some point. The exhibit attached to the judgment shows a line north of what we assume to be the railroad right-of-way, but (assuming that it was a fence) that line turns from being parallel to the right-of-way and goes east to the east boundary of the Reids' property. There also is a dotted line that may be the fence they were talking about. The claimed area cannot be identified with reasonable certainty.

The Huttons stated several times that the area was enclosed, but admitted that they had not enclosed the claimed area. The record does not clearly reflect how the area was enclosed. It does appear from Gary Hutton's brief reference that the Huttons were relying on an old fence near the railroad right-of-way referred to by Susan Reid. If that was a boundary, that fence was a casual fence.

7

Actual and visible possession can be established by a "designedly enclosed" fence, but not by a casual fence. *Orsborn*, 267 S.W.2d at 785-88; *Myers v. Wright*, 224 S.W.3d 466, 469 (Tex. App.—Dallas 2007, no pet.). Where a fence existed prior to the adverse claimant's possession of the land and the claimant fails to demonstrate the purpose for which the fence was erected, the fence is a casual fence. *Myers*, 224 S.W.3d at 469; *Mohnke v. Greenwood*, 915 S.W.2d 585, 593 (Tex. App.—Houston [14th Dist] 1996, no writ).

A claimant may substantially modify a casual fence and so change its character that the fenced-in area becomes a designed enclosure, *Rhodes*, 802 S.W.2d at 646, but there was only the brief testimony by Gary Hutton that he had repaired that fence. There was no evidence that the Huttons had done anything to modify that fence. Repairing or maintaining a casual fence, even for the express purpose of keeping the claimant's animals within the enclosed area, generally does not change a casual fence into a designed enclosure. *Rhodes*, 802 S.W.2d at 646.

The Huttons agree that, when a claimant relies on cattle grazing to establish title through adverse possession, he must present evidence that he "designedly enclosed" the land at issue and that the fence is not a casual fence. *See McDonald v. Weinacht,* 465 S.W.2d 136, 141-43 (Tex. 1971). Because the Huttons did not present such evidence, they claim there is an exception to the requirement of a designed enclosure when the claimant proves sufficient non-grazing use of the disputed land such that the true owner would have notice of the hostile claim. They cite *Perkins v. McGehee*, 133 S.W.3d 287, 292 (Tex. App.—Fort Worth 2004, no pet.); however, there was virtually no evidence of non-grazing use of the land except for the Huttons' testimony that they used the railroad right-of-way road. When asked what other basis the Huttons had for claiming adverse possession, other than the grazing of livestock, Gary Hutton answered, "The right of egress and entrance to the property."

*Perkins* is easily distinguishable because the fence in that case was not a casual fence: the ranch manager for the northern tract had used the property to graze cattle and had cleared brush and planted grass in the disputed area. The *Perkins* court found that the use of the tract by the McGehees and their predecessors had been adverse, hostile, and exclusive to anyone else for a period of ten years. 133 S.W.3d at 292-93.

The Huttons did not present evidence of non-grazing use of the claimed area "such that the true owner would have notice of their hostile claim." *See*                  *o*, 64 S.W.3d 166, 172 (Tex. App.—San Antonio 2001, no pet.). As stated, the Huttons admitted that they had not

enclosed the claimed area. The Huttons were asked by Interrogatory No. 4 to list all non-grazing uses made of the disputed one-half acre, more or less, that they contended would establish their claim of adverse possession. Their answer was as follows:

> Answer: The primary use of this small corner piece of land was for access to Plaintiffs' tract. Having been fenced and is used by Plaintiffs primarily for grazing of livestock, but also is used for access to larger tract for hunting and fishing.

Gary Hutton described the disputed area as being so small that it would not support a cow and that a cow could perhaps graze it for one day. Therefore, any grazing of the area by a cow was very intermittent and could not have been "continuous grazing" for the ten-year period. The Huttons' grazing of livestock in the disputed area and their hunters' hunting in the small area would not have given notice to anyone that the Huttons were claiming adverse possession of the small tract. The fact that their hunters also used the gate on the Reids' property to get to the boundary gate between the two tracts to hunt on Huttons' property from time to time also did not constitute notice of the Huttons' claim.

The same is true of the Huttons' testimony that they had used the railroad right-of-way road from the time that they acquired their property. This was a trespass to try title case, not an easement case. Use of the road was insufficient non-grazing evidence to establish ownership of an area of the Reids' property.

The Huttons had the burden of proving that they had exclusive domination over the claimed area for a period of at least ten years. Susan Reid testified that Gilbert gave her a key to the gate between Gilbert's land and county road 358 and that Susan had used it several times. Although Charles Hutton attempted to claim that the Huttons' use was exclusive, he admitted that there was a string of locks on the Reid gate.

According to Charles Hutton, the rock from the quarry on the Huttons' tract was used in the building of Lake Proctor in Comanche County. Construction of Proctor Dam was completed in 1963,[3] over twenty years before the Huttons acquired their tract. Gary Hutton described the railroad right-of-way as being a good all-weather road and convenient for them to access their property when they received a lot of rain. Inferences are never indulged in that favor the adverse claimant. *Bywaters*, 686 S.W.2d at 595. However, it is a reasonable inference from the Huttons'

---

[3]U.S. Army Corps of Engineers, http://www.swf-wc.usace.army.mil/proctor/Information/History.asp, search "History of Proctor Lake."

testimony that some predecessor of the Reids gave permission to a predecessor of the Huttons to use the all-weather road and build the gate between the two properties to allow the rock trucks to use the road.

The Huttons repeatedly testified that they believed that they owned the claimed area from the time of their purchase of their principal tract from the Hansens. Belief that they owned the area is insufficient. The Texas Supreme Court made it clear in *Orsborn*, 267 S.W.2d at 787-88, that there must be open or visible acts manifesting an intention to claim the land adversely. The acts of the Huttons – use of the railroad right-of-way road, occasional grazing by one cow, or an occasional hunter in the small area – were insufficient notice of an actual and visible appropriation of real property.

Because the Huttons testified that they always thought they owned the claimed area, they cite *Calfee v. Duke*, 544 S.W.2d 640, 642 (Tex. 1976). *Calfee* is not inconsistent with the earlier *Orsborn* opinion by the Texas Supreme Court. *Calfee* did not involve the issue of "open or visible acts" by the adverse possession claimant. And the facts in *Calfee w*ere quite different from the case now before us. In *Calfee*, the land in dispute (24.744 acres) was fenced together with 223.8 acres known as the "Moorefield homestead." *Calfee*, 544 S.W.2d at 641. Calfee acquired the fenced area by deed in 1946. That deed described the conveyed land as "embracing what has for many years been known as the Moorefield Homestead" and also set forth a full metes and bounds description. *Id*.

Calfee's mother was a daughter of J. H. Duke and may have been awarded an interest in the 24 acres, along with other Duke heirs, by a judgment in 1935. The Duke heirs in *Calfee* did not contend that Calfee's visible use and occupancy of the 24 acres failed to satisfy limitation requirements. Their contention was that Calfee became a cotenant with them upon his father's death (by inheriting the interest his mother had in the 24 acres that she had previously left to his father) and that he failed to give notice to the other Duke heirs of his repudiation of their title. The supreme court did not reach that issue. The court found that Calfee took possession of the fenced land in 1946 for himself and without a cotenancy relation to anyone. *Id*. The court then held that Calfee had claimed everything inside the fence and that, coupled "with his actual and visible possession and use," satisfied the adverse possession requirements of the statute before Calfee's father died in late 1956. *Id.* at 642.

The Huttons argue that the Reids were given notice of the Huttons' claim in the title policy issued to the Reids. The title policy excluded any loss from "any rights of the public or owners of [the] adjoining tract to use" the gravel drive from county road 358 to the property adjoining the west side of the Reids' tract "as depicted on plat of survey . . . dated April 19, 2005." The Reids acquired their tract by deed dated April 29, 2005, from Gilbert. The title policy gave notice to the Reids that the Huttons may have had an easement to use the railroad right-of-way road; it did not give notice that the Huttons claimed ownership of an entire area. But even if we assume that the title policy gave notice to the Reids of the Huttons' adverse possession claim to an area, it is not helpful because the Huttons had to show that they gave notice by acts over a ten-year period that included the time that the Gilberts owned the land. The title policy to the Reids gave no notice to the Gilberts of an adverse possession claim by the Huttons.

The Huttons failed to set forth an accurate description of the claimed area. The acts of the Huttons were insufficient notice of an actual and visible appropriation of real property. And, the unconditional offer by Gary Hutton to buy the area was an acknowledgment of title in the Reids. *R. W. Wier Lumber Co. v. Eaves*, 296 S.W. 481 (Tex. Comm'n App. 1927); *Houston Oil Co. of Texas v. Pullen*, 272 S.W. 439 (Tex. Comm'n App. 1925); *Flowers v. Sun NLF Ltd. Partnership,* No. 08-00-00418-CV, 2002 WL 1938652 (Tex. App.—El Paso 2002, no pet.) (not designated for publication); *Wolgamot v. Corley*, 523 S.W.2d 491 (Tex. Civ. App.—Waco 1975, writ ref. n.r.e.).

In response to the Reids' request for admissions, the Huttons admitted they had offered to purchase the area from the Reids. At trial, Gary Hutton admitted again that he offered to buy the area and to pay all the costs. However, Gary's counsel subsequently asked if Gary made the offer to purchase the land or to "buy peace," and Gary responded that his offer was "really" to buy peace. That answer was obviously an attempt to negate the Huttons' admission (and Gary's admission) and to characterize his offer to purchase the area as not being a recognition of the Reids' ownership. *See Meaders v. Moore*, 132 S.W.2d 256 (Tex. App. 1939). *But see Singleton v. Sw. Settlement & Dev. Corp.,* 322 S.W.2d 677 (Tex. Civ. App.—Beaumont 1959, no writ) (possession was not adverse, despite claimant's assertion that, in making the offer, he had merely been trying to buy peace).

11

We recognize that the Huttons' offer to purchase the area from the Reids came after the ten-year period asserted by the Huttons. An acknowledgment of title in another made after the limitation period has been completed does not have the effect of destroying a completed limitation title, but it is evidence tending to show that the possession was not adverse. *Bruni v. Vidaurri,* 166 S.W.2d 81, 88 (Tex. 1942); *Peters v. Gillund*, 186 S.W.2d 1019, 1020 (Tex. Civ. App.—Galveston 1945, writ ref'd w.o.m.). Here there was not a completed limitation title because of the lack of notice to the Gilberts and the Reids and the failure to meet the requirement of defining the claimed area. The Huttons' offer to purchase the area, coupled with their failure to tell the Reids that they claimed ownership of the area, established that their possession was not adverse.

Issues 2, 4, and 5 of the Reids are sustained. We need not discuss the Reids' remaining two issues.

*This Court's Ruling*

The judgment of the trial court is reversed and judgment is rendered for the Reids.


TERRY McCALL

JUSTICE


August 18, 2011

Panel consists of: Wright, C.J.,
McCall, J., and Kalenak, J.