In The



Court of Appeals



Ninth District of Texas at Beaumont



____________________



NO. 09-05-100 CV


____________________



C.W. KING, Appellant



V.



MAMIE GRISBEE, Appellee






On Appeal from the 221st District Court


Montgomery County, Texas


Trial Cause No. 02-04-02869-CV






MEMORANDUM OPINION


 Mamie Beeson Grisbee sued C. W. King in trespass to try title, which included a
boundary determination, as well as suit to quiet title, all involving a 20.33 acre tract of land
located in Montgomery County, Texas. (1) See Tex. Prop. Code Ann. § 22.001 (Vernon
2000). King responded in his third amended answer with a counterclaim alleging, inter alia,
he acquired ownership of the 20.33 acres in question by adverse possession. See Tex. Civ.
Prac. & Rem. Code Ann. § 16.021(1) (Vernon 2002). Ultimately, a bench-trial was
conducted on November 8, 2004. The trial court heard testimony from both Grisbee and
King, as well as from Seth Gibson, a licensed surveyor, and from a Montgomery County
Commissioner. Several exhibits were introduced by the parties. Following the close of
testimony, the trial court took the case under advisement, and later issued its ruling in favor
of Grisbee. The court later issued findings of fact and conclusions of law. King prosecutes
this appeal.

 The general rule now requires boundary disputes to be determined via a statutory
trespass to try title action, and not an action for declaratory judgment. See Martin v.
Amerman, 133 S.W.3d 262, 264-67 (Tex. 2004). The significance of denoting the suit as a
"boundary dispute," as opposed to one of "pure question of title," allows for a lessening of
the harsh effects of the strict pleading and proof requirements applicable to trespass to try
title actions. Id. at 265. The issue is moot in the instant case as Grisbee's live pleadings
essentially adhere to the form prescribed by the Rule for pleading a trespass to try title action. 
See Tex. R. Civ. P. 783. More importantly, Grisbee's proof appears to conform to the law
for establishing title in a trespass to try title action.

 A trespass to try title action is a procedure by which claims to title or the right of
possession may be adjudicated. See King Ranch, Inc. v. Chapman, 118 S.W.3d 742, 755
(Tex. 2003). "To recover in a trespass to try title action, the plaintiff must recover on the
strength of [her] own title." Rogers v. Ricane Enters., Inc., 884 S.W.2d 763, 768 (Tex.
1994). The plaintiff may recover (1) by proving a regular chain of conveyances from the
sovereign, (2) by proving title by a superior title out of a common source, (3) by proving title
by limitations, or (4) by proving prior possession, and that the possession has not been
abandoned. See Martin, 133 S.W.3d at 265.

 A suit to quiet title or remove a cloud on title is different from a trespass to try title
action. See Fricks v. Hancock, 45 S.W.3d 322, 327 (Tex. App.--Corpus Christi 2001, no
pet.). The principle issue in a suit to quiet title is whether there is a cloud that equity will
remove. See Wright v. Matthews, 26 S.W.3d 575, 578 (Tex. App.--Beaumont 2000, pet.
denied). The purpose for such a suit is "'to enable the holder of the feeblest equity to remove
from his way to legal title any unlawful hindrance having the appearance of better right.'" 
Bell v. Ott, 606 S.W.2d 942, 952 (Tex. Civ. App.--Waco 1980, writ ref'd n.r.e.) (quoting
Thomson v. Locke, 66 Tex. 383, 1 S.W. 112, 115 (1886)). "Any deed, contract, judgment or
other instrument not void on its face that purports to convey any interest in or make any
charge upon the land of a true owner, the invalidity of which would require proof, is a cloud
upon the legal title of the owner." Wright, 26 S.W.3d at 578. 

 Adverse possession is statutorily defined as "an actual and visible appropriation of
real property, commenced and continued under a claim of right that is inconsistent with and
is hostile to the claim of another person." Tex. Civ. Prac. & Rem. Code Ann. § 16.021(1). 
An early case setting out the elements that must be proven by a party claiming title to
property under adverse possession included the following discussion:

 It is well settled, that, where a party relies upon naked possession alone
as the foundation for his adverse claim, it must be such an actual occupancy
as the law recognizes as sufficient, if persisted in for a long enough period of
time, to cut off the true owner's right of recovery.

 It has been said that such possession must not only be actual, but also
visible, continuous, notorious, distinct, hostile (i.e., adverse), and of such a
character as to indicate unmistakably an assertion of a claim of exclusive
ownership in the occupant.


Satterwhite v. Rosser, 61 Tex. 166, 171, 1884 WL 8738, at *4 (1884) (citations omitted). 

 A party seeking to establish title to land by virtue of adverse possession has the
burden of proving every fact essential to that claim by a preponderance of the evidence. See
Rhodes v. Cahill, 802 S.W.2d 643, 645 (Tex. 1990) (footnote omitted). A putative adverse
possessor who raises limitations under the three, five, ten, or twenty-five year limitations
periods must also prove, inter alia, "peaceable and adverse possession." See Tex. Civ. Prac.
& Rem. Code Ann. §§ 16.024-.028, 16.030 (Vernon 2002). "'[T]he question of adverse
possession normally is a question of fact, so only in rare instances is a court justified in
holding that adverse possession has been established as a matter of law.'" See Rhodes, 802
S.W.2d at 646 (quoting Bywaters v. Gannon, 686 S.W.2d 593, 595 (Tex. 1985)). One
essential element of adverse possession is that the claimant's possession must be an "actual
and visible appropriation" of the land. See Tex. Civ. Prac. & Rem. Code Ann. § 16.021(1). 
Such possession "'must be of such character as to indicate unmistakably an assertion of a
claim of exclusive ownership in the occupant.'" Rhodes, 802 S.W.2d at 645 (quoting Rick v.
Grubbs, 147 Tex. 267, 214 S.W.2d 925, 927 (1948)).

 King raises eight issues in his appeal. The first four issues essentially complain of the
absence of both legally and factually sufficient evidence to sustain the judgment in favor of
Grisbee. The next two issues contend the record contains both legally and factually
sufficient evidence to support judgment for King on his claim of title by adverse possession. 
King's seventh issue complains of the finding by the trial court that certain recorded deeds
purporting to establish King's title to the 20.33 acres (2) in question were in fact invalid and
failed to convey any title to King. Finally, King points to error by the trial court in awarding
attorney's fees to Grisbee. 

 Findings of fact in a case tried to the court have the same force and effect as a jury's
verdict on special issues. Anderson v. City of Seven Points, 806 S.W.2d 791, 794 (Tex.
1991). We review the trial court's findings of fact by the same standards that are applied in
reviewing the evidence supporting a jury's answers. See Catalina v. Blasdel, 881 S.W.2d
295, 297 (Tex. 1994). However, we review conclusions of law as a legal question. BMC
Software Belgium, N.V. v. Marchand, 83 S.W.3d 789, 794 (Tex. 2002). Conclusions of law
may not be challenged for factual insufficiency, but the record facts may be used to
determine a conclusion of law's correctness. See id. So long as the trial court rendered the
proper judgment, an erroneous conclusion of law will not require reversal. See id. 

 A party attacking the factual sufficiency of an adverse finding on an issue for which
it did not have the burden of proof must demonstrate there is insufficient evidence to support
the adverse finding. See Croucher v. Croucher, 660 S.W.2d 55, 58 (Tex. 1983); Hickey v.
Couchman, 797 S.W.2d 103, 109 (Tex. App.--Corpus Christi 1990, writ denied). In
reviewing an insufficient evidence challenge, we examine the entire record and will set aside
the finding only if the evidence that supports the finding is so weak as to be clearly wrong
and manifestly unjust. See Ortiz v. Jones, 917 S.W.2d 770, 772 (Tex. 1996); Cain v. Bain,
709 S.W.2d 175, 176 (Tex. 1986). If a party is challenging a finding on an issue for which
it had the burden of proof, that party must demonstrate that the adverse finding is against the
great weight and preponderance of the evidence. Dow Chem. Co. v. Francis, 46 S.W.3d 237,
242 (Tex. 2001). In reviewing a challenge that the finding is against the great weight and
preponderance of the evidence, the reviewing court first examines the record to determine
if there is some evidence to support the finding; if such is the case, then the court must
determine, in light of the entire record, whether the finding is so contrary to the
overwhelming weight and preponderance of the evidence as to be clearly wrong and
manifestly unjust, or whether the great weight and preponderance of the evidence supports
its nonexistence. See Herbert v. Herbert, 754 S.W.2d 141, 143 (Tex. 1988); Traylor v.
Goulding, 497 S.W.2d 944, 945 (Tex. 1973).

 In the instant case, a substantial portion of the testimony involved witnesses testifying
about and pointing to various places on a formal plat, on an uncertified, plat-like drawing,
and on smaller-size copies of historical plats. This type of testimony was extremely difficult
to follow in the record. As such, we note that we give deference to the trial court's
evaluation of the evidence owing its ability to not only hear the witnesses' responses, but to
actually observe the responses as well. (3) 

 To prevail on her causes of action, Grisbee was required to prove superior title and
to recover on the strength of her own title. See Rogers, 884 S.W.2d at 768. As previously
noted, one such method is to prove superior title emanating from a common source. Martin,
133 S.W.3d at 265. An examination of the record indicates that Grisbee met her burden
through a combination of her testimony and exhibits as well as through certain testimony
from King. For instance, King attempted to prove his superior title in the disputed 20.33
acres by, inter alia, the existence of a series of deeds. As part of his proof, King attempted
to establish that his father actually purchased the 20.33 acres from certain parties who were
alleged to have been awarded the land in a 1935 partition suit judgment. In an apparent
attempt to clarify King's position on this issue, the trial court interposed questions to King
during his direct examination testimony, the pertinent part of which appears in the record as
follows:

 THE COURT: Are you talking -- are you -- in relation to the subject
property, what are we talking about? Where are you talking -- 


 THE WITNESS [King]: Okay. In 1953 there was some Spray -- I think
their name was Sprayberry [sic]. I was a child and they come out --


 THE COURT: Okay. Let's -- let's -- okay. So your dad bought this 53
acres up here.


 THE WITNESS: Yes, ma'am. 


 THE COURT: Okay.


 THE WITNESS: And he fenced this over here. This was fenced right
here. See how that overlaps where they are claiming the 20 - - the 20 acre tract
south line is supposed to be where the fence lines come down here and
overlap.


 THE COURT: He fenced that.


 THE WITNESS: Yes, ma'am, he fenced that.


 THE COURT: Why did he - - 


 THE WITNESS: In '53.


 THE COURT: Did he know it wasn't his?


 THE WITNESS: Well, he had bought - - there's - - 


 THE COURT: Did he think he owned it or why did he do that?


 THE WITNESS: What happened there was two - - there was two ladies
and a gentleman come out and he was in there fishing and they come in there
and they said they were going to put a for sale sign, they claimed to be the
heirs. There were hundreds of heirs in this thing and so he bought the
Sprayberry [sic]. He wrote them a check and bought them out and they
showed him where the lines were down in here and he fenced it and - - 


 THE COURT: So these people claimed they owned this. 


 THE WITNESS: Yes. Yes, ma'am. 


 THE COURT: This whole 20 acres?


 THE WITNESS: Yes, ma'am. There is about 100 acres - - heirs in
there or more now, yes, ma'am.


 THE COURT: And they showed him a deed or something. What did
they show him to make him think they owned it?


 THE WITNESS: Well, the Jefferys [sic] - - not the Jefferys [sic]. 
Sprayaberrys [sic], Jefferys [sic] and Clarks and the Judge ruled - - there was
several different families that owned it and the Sprayberrys did, in fact, receive
some of the undivided interest. 


 THE COURT: So, the reasons that he thought they owned it was
because he saw a deed or because why?


 THE WITNESS: Because they claimed - - 


 THE COURT: Because they told him?


 THE WITNESS: They told him. 


 THE COURT: Said we own it?


 THE WITNESS: We own it and he bought it and he fenced it in 1953.


 THE COURT: Okay. So you have a deed from them to your dad for
this 20 acres?


 THE WITNESS: No ma'am. That's - - when they came out he paid
them by check and that was it. In those days that's the way they did the
business.


 THE COURT: Okay. 


 THE WITNESS: But we did fence it and we did run cattle on it - - 


 THE COURT: Okay.


 THE WITNESS: - - in 1953 and I still own it. Still own it today.


 The above testimony indicates that King fully recognized that the disputed 20.33 acres
had its source in the 1935 partition suit, more fully discussed below, as well as the 53.7 acre
tract purchased by King's father, which was north of the 20.33 acre tract. Simply put, the
53.7 acre King tract (not in dispute in the instant litigation) and the 20.33 acre tract were both
part of the William Kibbe survey, which the 1935 suit partitioned. 

 As further proof of her superior title, Grisbee introduced into evidence Plaintiff's
Exhibit 4, a certified copy of a judgment entered in 1935, in the Montgomery County District
Court, cause number 17628, and styled Green Smith et al. v. Juliette Kennedy et al. The
judgment awarded certain tracts of land located on the "Wm. Kibbe Survey of 640 acres" to
a large number of named individuals. Among those awarded land were "Malinda Spraberry,"
and "Clyde Spraberry." (4) Grisbee's proof also included Plaintiff's Exhibit 20, a copy of what
is referred to as the "Hodge Mason Map," showing the 20.33 acre tract in question as well
as a large number of surrounding tracts. The map indicates the 20.33 acre tract, as well as
the tracts appurtenant to it, are part of the William Kibbe survey. Additionally, Plaintiff's
Exhibit 5, the plat drawn up by Seth Gibson, the registered surveyor, indicates the land he
surveyed was situated within the "William Kibbe survey, A-303." 

 Plaintiff's Exhibit 3, also introduced by Grisbee, is a copy of the deed from Paul W.
Jeffrey and William P. Jeffrey conveying to Melvin Beeson, Grisbee's first husband, the
following informally described real property:

 [A]ll that certain tract or parcel of land being 20-1/3 acres of land out of the
William Kibbe survey in Montgomery County, Texas, and being the north 20-1/3 acres out of Lot No. 2, containing 40 acres and lot No. 5, containing 24
acres, awarded to the said Paul W. Jeffrey and other parties in the partition of
the north half of the said William Kibbe survey in the cause of Green Smith
et al. Vs. Juliette Kennedy number 17628 in the District Court of Montgomery
County, Texas[.]


 Plaintiff's Exhibit 3 also contains a "metes and bounds" description of the tract
conveyed to Beeson with the deed executed and filed in 1951. The record indicates that
King's father purchased the 53.7 acre tract north of and adjoining the 20.33 acre tract in
1953, with Plaintiff's Exhibit 6 being the deed evidencing this conveyance. However, except
for his testimony, King produced no documentary evidence indicating a proper chain of
conveyances of the 20.33 acre tract from one of the prevailing parties in the 1935 partition
suit to himself. Finally, in 1961, Grisbee and Melvin Beeson divorced, and in connection
with the property settlement, Melvin conveyed several tracts of land to Grisbee via quitclaim
deed, one of the tracts being the 20.33 acres in question. Plaintiff's Exhibit 1 is a certified
copy of Melvin's quitclaim deed to Grisbee. 

 The longstanding method of proving ownership by "common source" in a trespass to
try title action was concisely explained in the following manner:

 The theory of the doctrine of the common source is that proof of a claim of
title by one under another is prima facie evidence, as against the claimant, that
the title was at one time in that other; so that when the plaintiff shows that he
has a valid chain of title from a certain grantor, and that the defendant claims
under the same grantor, without proving what the defendant's title is, he
[plaintiff] shows prima facie that he is owner of the land, and it then devolves
upon the defendant to show the authority of his own title. 


Simmons Hardware Co. v. Davis, 87 Tex. 146, 27 S.W. 62, 63 (1894). As noted above, King
admitted his father received no deed from whoever purportedly sold him the 20.33 acres in
question. King further disclosed that at the time of this purported sale he was only about
eight years old. 

 Additionally, and as part of her suit to quiet title, Grisbee introduced into evidence for
the trial court's consideration Plaintiff's Exhibits 7 through 19 which are all deeds purporting
to convey various tracts of land involving King and/or the King family. Most of the deeds
represent King-to-King transactions with the subject tracts including land both inside and
outside the 20.33 acres in question. The undisputed testimony from the surveyor, Seth
Gibson, was that his deed search prior to surveying the land in question disclosed no deeds
from Melvin Beeson to any of the King family members, nor did Gibson find any chain of
title going to the King-to-King deed tracts that conflicted with 20.33 acres conveyed by the
Jeffrey to Melvin Beeson deed (Plaintiff's Exhibit 3). 

 Based upon the record evidence, we find both legally and factually sufficient evidence
to support the trial court's findings that Grisbee established superior title to the 20.33 acre
tract from a common source (FF-2); that Grisbee personally acquired the 20.33 acre tract
from the deed from her former husband, Melvin Beeson (FF-3); and that none of the recorded
King-to-King deeds conveyed title to King or his predecessors of any portion of the 20.33
acre tract (FF-8 through 16). Issues one, two, three, four, and seven are overruled. We now
turn to King's counterclaim attempting to establish title by adverse possession because such
title, when perfected, is as good as title by patent from the state. See Butler v. Hanson, 455
S.W.2d 942, 946 (Tex. 1970); Republic Nat'l Bank of Dallas v. Stetson, 390 S.W.2d 257, 260
(Tex. 1965); Gibbs v. Lester, 41 S.W.2d 28, 30 (Tex. Comm'n App. 1931, judgm't adopted). 
 The fact that Grisbee sufficiently proved her title to the 20.33 acre tract from a
common source meant that the burden shifted to King to prove his superior title to the
property by showing, inter alia, that he held under a superior title. See Davis v. Gale, 160
Tex. 309, 330 S.W.2d 610, 612 (1960). The trial court essentially found that King did not
meet his burden. Recall that King, as the party challenging the adverse possession findings
for which he had the burden of proof, must demonstrate that the adverse findings are against
the great weight and preponderance of the evidence. See Francis, 46 S.W.3d at 242. Our
review requires an examination of the entire trial record in order to determine whether the
trial court's findings are so contrary to the overwhelming weight and preponderance of the
evidence as to be clearly wrong and manifestly unjust, or whether the great weight and
preponderance of the trial evidence supports the nonexistence of King's title by adverse
possession. Herbert, 754 S.W.2d at 143; Traylor, 497 S.W.2d at 945.

 As set out above, King testified that as a child, he recalled that his father fenced the
20.33 acre tract in question following its purchase from the Spraberrys in 1953. King stated
that, although he was just a boy, he assisted his father in fencing the property. Using Seth
Gibson's plat (Plaintiff's Exhibit 5), King went on to indicate where he and his father erected
fences. King testified that once the property was fenced, his father placed a hog pen and a
garden on the property, and "[ran] some cows in there." King stated he never observed
Grisbee on the property. King then proceeded to testify to certain buildings and dwellings
placed upon the 20.33 acre tract. He stated that in the early 1970's, a barn was built on the
property, and the parties agreed that a house was built on the property in 1972. Defendant's
Exhibit 8, a non-scale version of the 20.33 acre tract in question introduced by King further
reflects that two mobile homes and what appears to be a wood-frame house were also placed
on the property. However, in examining the photographs attached to Defendant's Exhibit
8 depicting the various structures placed upon the land in question, one immediately notices
the densely wooded nature of the property and the absence of any indication of fences or
fence materials. The photographs do not indicate the presence or former presence of any
animals, such as hogs, horses, or chickens. King stated that he has lived on the 20.33 acre
tract in question since 1971. He also stated that he planted trees on the property in the early
1960's as part of a school project. King also noted that he has never seen Grisbee on the
property in question and that she has never been to his house. King also disputed the fact
that a 60-foot right-of-way, deeded to Montgomery County by Melvin Beeson but never
formally accepted by the County as a County Road, was not also adversely possessed by him
and his predecessors in interest, as evidenced by his designation of the road as "King Lane." 
 

 The trial court also had before it Grisbee's evidence on the issue of King's adverse
possession. Grisbee was eighty-seven years old at the time of trial. She testified she and her
first husband, Melvin Beeson, bought the 20.33 acre tract in 1947, and that she and Melvin
lived on an adjacent tract at the time of the purchase. Grisbee explained that although the
purchase of the 20.33 acre tract took place in 1947, "the attorney" only brought the deed to
her and Melvin in 1951. Grisbee further testified that she and Melvin "fenced the whole bit,"
including, in 1953, the 20.33 acre tract. After fencing the property, she and Melvin placed
cattle on the property as well as four mules. Grisbee stated that Melvin placed a fence along
the north line of the 20.33 acre tract, which was also north of the 60-foot right-of-way to the
County. From an examination of Plaintiff's Exhibit 5, this fence would effectively separate
the 53.7 acres of undisputed King property from the 20.33 acre tract in question. Also,
between 1947 and 1952, Melvin conducted a sawmill business on a portion of the 20.33 acre
tract. In approximately 1954, a house was built in the middle of the 20.33 acre tract for
Grisbee's parents to live in. 

 At certain periods of time, Grisbee moved away from her home on the tract adjacent
to the 20.33 acres. Grisbee and Melvin divorced and Grisbee later married Wilber Grisbee
in 1964. During the late 1970's or early 1980's, Grisbee opened a drive-in grocery on the 12
acre tract adjacent to the 20.33 acre tract. Grisbee denied ever seeing King placing cattle on
the 20.33 acre tract, and denied ever seeing King plowing the property to plant peas or
vegetables. However, Grisbee was aware that someone had torn down the fence Melvin
Beeson built on the boundary line between the 53.7 acre King tract and the 20.33 acre tract.
Grisbee surmised that the fence was torn down sometime during the years 1984 to 1986,
when she and Wilber Grisbee were in Missouri for Wilber's cancer treatment. Grisbee
further testified that she observed four horses belonging to King on the 20.33 acre tract in
1986, when she returned from Missouri, but within one to two months the horses were gone. 

 On cross-examination, Grisbee stated she crossed the 20.33 acre tract each time she
visited Billy King, her ex-brother-in-law, by leaving her house and walking through the
woods. Grisbee denied encountering any fences within the 20.33 acre tract during her walks
to Billy King's home. Grisbee explained that as she was raised in the woods, she had no
problems walking through them to get to her ex-brother-in-law's home. Grisbee stated that
she had observed a mobile home on the 20.33 acre tract approximately one year before, and
she assumed the mobile home belonged to King or the King family. Grisbee opined King
placed the mobile home on the property during the time Grisbee was in Missouri with
Wilber. Grisbee did admit that since the time of her separation from Melvin Beeson nothing
has been done with the 20.33 acre tract. Since that time, she has kept the property "mowed
and clean." Grisbee also admitted that she paid taxes on the property until 1989, "and that's
when I quit." Grisbee reiterated that she had never seen King on the 20.33 acre tract nor had
she seen him cultivate it. Grisbee also stated that she had never seen any houses on the 20.33
acre tract, but explained that she had not been "that far down in there." 

 King's case for adverse possession was based almost entirely on his own testimony. 
Only two of his exhibits were admitted into evidence. Furthermore, much of the testimony
from Grisbee and from King as to historical events and circumstances was conflicting and
hotly disputed. 

 In reviewing the evidence, we accord due deference to the trial court, which,
as the trier of fact presented with conflicting testimony, is the sole judge of the
credibility of the witnesses and the weight to be given their testimony. See
McGalliard v. Kuhlmann, 722 S.W.2d 694, 697 (Tex. 1986). The court, as
trier of fact, is free to believe one witness and disbelieve others [and] the court
may resolve inconsistencies in a witness's testimony[.] . . ." 


Akers v. Stevenson, 54 S.W.3d 880, 884 (Tex. App.--Beaumont 2001, pet. denied). For
example, the trial court heard testimony from King that he assisted his father in fencing the
entire 20.33 acre tract in 1953, and heard Grisbee testify that she and her husband, Melvin
Beeson, fenced in the 20.33 acre tract along with their other adjoining tracts also in 1953. 
The credibility of each witness was for the trial court to determine. 

 As previously noted, the party seeking to establish title by adverse possession has the
burden to prove every fact essential to the claim by a preponderance of the evidence. 
Rhodes, 802 S.W.2d at 645. The possession must be of such character as to indicate
unmistakably an assertion of a claim of exclusive ownership in the occupant. Id. In
determining what will amount to adverse possession, considerable importance is placed on
the nature of the land and its use. Wall v. Carrell, 894 S.W.2d 788, 800 (Tex. App.--Tyler
1994, writ denied). Both King and Grisbee can point to virtually identical uses made of the
tract in question -- the erecting of fences; the grazing of cattle, the placing of horses, or
mules, or hogs, or chickens on the property; and the planting of trees and other cultivation. 
Grisbee built a house in the middle of the tract for her parents. King's family appears to have
built two dwellings also on the tract, as well as a barn, and placed mobile homes there. 
Grisbee and her first husband, Melvin, ran a sawmill business on a portion of the tract for a
number of years. However, the "nature of the land" in question was shown to be heavily
forested and densely wooded. King, as the party with the burden of proof, was required to
establish the essential facts of "actual and visible appropriation" of the tract in question, that
was "inconsistent with and is hostile to" Grisbee's claim of title, to the satisfaction of the trial
court sitting as factfinder. See Tex. Civ. Prac. & Rem. Code Ann. § 16.021(1). 

 The Supreme Court's discussion of the legal implications of the facts in Rhodes v.
Cahill is highly instructive. In Rhodes, Cahill was asserting title by adverse possession to
five tracts of cedar trees ("cedar tracts") against Rhodes, the record owner of the cedar tracts. 
802 S.W.2d at 644. Many years prior to the litigation, Cahill had purchased an adjoining
tract ("Cahill tract"), and at the time of said purchase an old fence enclosed both the Cahill
tract and the cedar tracts, but no interior fence or other visible sign denoted the boundary
between the two tracts. Id. We reproduce the Court's description of the pertinent record-facts:

 L. C. Cahill married Marjorie Cahill in 1943. They lived on the Cahill tract
until his death in 1975, whereupon his interest passed by will to Marjorie. The
Cahills used their property and the cedar tracts for grazing cattle and goats. 
They cleared cedar trees and brush from the land for this purpose, but the cedar
tracts were never cultivated or improved in any other way. Mr. Cahill posted
"No Trespassing" signs at various points on the fence surrounding his
property, but there is no evidence that such signs were actually placed on that
part of the fence enclosing the cedar tracts. It was stipulated that the Cahills
paid property taxes on about 200 acres of land for the years 1956 to 1979. 


 Shortly after Mr. Cahill's death, Marjorie Cahill learned that a church
might be built on one of the five cedar tracts. Mrs. Cahill thereupon filed an
affidavit of limitation in the deed records of Williamson County, Texas. When
a buyer offered to purchase both the Cahill tract and the five cedar tracts in
1980, Mrs. Cahill brought suit against various known and unknown defendants
to establish title to the [five cedar tracts] by adverse possession. 


 . . . .


 Following a non-jury trial, the trial court found Mrs. Cahill to be the
record owner of one cedar tract and awarded her a part of the sale proceeds,
rendered judgment that she take nothing as to her adverse possession claims
to the other four cedar tracts, and ordered the remainder of the proceeds
distributed among the known and unknown heirs of Elisha Rhodes. . . . In an
unpublished opinion, the court of appeals, holding that Mrs. Cahill established
title by adverse possession as to all five tracts as a matter of law, reversed and
rendered judgment in her favor. 


Id. Reversing the court of appeals's decision, the Supreme Court held that Cahill did not
conclusively establish, as a matter of law, title to any of the five cedar tracts. Id. at 646. The
Supreme Court remanded the case to the court of appeals for consideration of Cahill's factual
sufficiency point. Id. In so holding, the Supreme Court applied Cahill's facts to the law of
adverse possession in the following manner:

 Although the Cahills lived continuously on their 177-acre tract for much
longer than the statutory ten-year period, their use of the cedar tracts must
constitute an actual and visible appropriation of the land such that the true
owner is given notice of a hostile claim. . . . Mrs. Cahill claims to have
provided such evidence with her testimony that her husband had cleared and
sold cedar trees from the land. However, she could not verify whether those
trees were removed from the Cahill tract or the cedar tracts. Even if she did
establish that the trees were from the contested area, neither one isolated
commercial sale of cedar nor selective clearing for grazing purposes is
sufficient to show adverse possession over a ten-year period as a matter of law. 


 The parties' stipulation that the Cahills paid property taxes on
approximately 200 acres of land from 1956 through 1979 is also insufficient
to demonstrate actual and visible appropriation of the land as a matter of law.
. . . Nonetheless, while payment of these taxes is competent evidence of
adverse possession, it is insufficient to establish adverse possession as a matter
of law under the ten year statute. . . . 


 Finally, Mrs. Cahill testified that she and her husband grazed cattle and
goats on the cedar tracts. This evidence is insufficient to establish title by
adverse possession unless the cedar tracts were designedly enclosed for the
Cahill's use. Although it is unknown who erected it, the evidence suggests
that the fencing which bordered two sides of the cedar tracts was standing
when Mr. Cahill purchased the property. The evidence indicates that Mr.
Cahill occasionally repaired the fence, added net wire and additional barbed
wire to it, and replaced some of the fence posts. 


 Under the applicable case law, there are two kinds of fences: "casual
fences" and fences that "designedly enclose" an area. If the fence existed
before the claimant took possession of the land and the claimant fails to
demonstrate the purpose for which it was erected, then the fence is a "casual
fence." Repairing or maintaining a casual fence, even for the express purpose
of keeping the claimant's animals within the enclosed area, generally does not
change a casual fence into a designed enclosure. 


Id. at 645-46 (citations omitted).

 Considering the discussion set out above, King clearly failed to prove adverse
possession of the 20.33 acre tract as a matter of law. Confined to King's testimony and
Defendant's Exhibit 8, an uncertified informally drawn plat-like diagram, we can find no
abuse of discretion on the trial court's part in ruling against him. (5) As noted above, all of the
significant historical facts to which King testified were disputed by testimony from either
Grisbee or Gibson, or both, as well as by the numerous exhibits introduced by Grisbee. 
Considering all the record evidence, the trial court's finding (FF-7) that King "failed to prove
by a preponderance of credible evidence all elements of adverse possession of any part of the
Grisbee Property or the 15.389 acres" is not so contrary to the overwhelming weight and
preponderance of the evidence as to be clearly wrong and manifestly unjust. See Herbert,
754 S.W.2d at 143. Issues five and six are overruled.

 King's final issue contends the award of attorney's fees to Grisbee was improper. We
agree. In the instant case, the parties' substantive claims were governed by the trespass-to-try-title statute and by equitable suit to quiet title. The trespass-to-try-title statute does not
authorize an award of attorney's fees. See Tex. Prop. Code Ann. §§22.001 - 22.045
(Vernon 2000); Martin, 133 S.W.3d at 267. Likewise, attorney's fees are not available in a
suit to quiet title or to remove a cloud on title. See Sani v. Powell, 153 S.W.3d 736, 745
(Tex. App.--Dallas 2005, pet. denied). Based on the facts and circumstances presented, any
other cause pleaded by Grisbee was "merely incidental" to the title and boundary issues
raised in her live pleadings. See John G. & Marie Stella Kenedy Mem'l Found. v. Dewhurst,
90 S.W.3d 268, 289 (Tex. 2002). Therefore, King's issue eight is sustained and Grisbee's
attorney's fees are denied. The judgment of the trial court is modified to delete the award
of attorney's fees. As modified, the judgment is affirmed. 

 AFFIRMED AS MODIFIED.

 __________________________________

 CHARLES KREGER

 Justice


Submitted on December 15, 2005

Opinion Delivered September 14, 2006



Before McKeithen, C.J., Kreger and Horton, JJ.
1. Grisbee's original petition included other defendants but they were subsequently severed
from her action against C.W. King. Grisbee's live pleading, filed April 30, 2004, named C. W.
King as lone defendant. 
2. The 20.33 acres consists of two adjacent "tracts" of land; one tract referred to as the "60-foot right-of-way," was granted to Montgomery County by a recorded deed from Melvin Beeson,
but was never formally accepted by the County. The other tract is referred to in certain
pleadings, testimony, final judgment, and findings of fact and conclusions of law as the "15.389
acres," "15.89 acres," or "15.87 acres." For the sake of clarity, we will refer to the property in
dispute as the "20.33 acres," or "20.33 acre tract." 
3. While the general rule is that findings of fact in a case tried to the court have the same
force and dignity as a jury's verdict upon jury questions, it is also to be noted that the court's
findings are not conclusive when a complete reporter's record appears in the record. See
Swanson v. Swanson, 148 Tex. 600, 228 S.W.2d 156, 158 (1950); Garlington v. Boudreaux, 921
S.W.2d 550, 552 (Tex. App.--Beaumont 1996, no writ). Without a complete reporter's record,
we normally presume that sufficient evidence was introduced to support the trial court's findings
of fact and conclusions of law, and that the judgment was based upon those findings and
conclusions. See Mays v. Pierce, 154 Tex. 487, 281 S.W.2d 79, 82 (1955); Blount v. Dutton, 967
S.W.2d 955, 956 (Tex. App.--Beaumont 1998, no pet.). 
4. Apparently Clyde Spraberry had no individual right of recovery but was named pro-forma as a party only by way of his wife's interest in a portion of the land in question. 
5. The photographs attached to this map depict only "selective clearing" of the property
shown. See Rhodes, 802 S.W.2d at 645.